George **RAMSEY** et al., Plaintiffs,

v.

The **UNITED MINE WORKERS OF AMERICA**, Defendant.

**TENNESSEE PRODUCTS & CHEMICAL CORPORATION**, Plaintiff,

v.

The **UNITED MINE WORKERS OF AMERICA** and West Kentucky Coal Company, Defendants.

Civ. A. Nos. 3667, 4189.

United States District Court
E. D. Tennessee, S. D.

March 4, 1967.

John A. Rowntree, Knoxville, Tenn., William M. Ables, Jr., A. A. Kelly, South Pittsburg, Tenn., Clarence Walker, Sizer Chambliss, Chattanooga, Tenn., for plaintiffs Ramsey and others.

John A. Rowntree, Knoxville, Tenn., Waller, Lansden & Dortch, Nashville, Tenn., for plaintiff Tennessee Products.

Harrison Combs, Willard P. Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., for defendant United Mine Workers.

## OPINION

FRANK W. WILSON, District Judge.

These two lawsuits involve antitrust actions instituted against the United Mine Workers of America by a number of coal operators from the Southeastern Tennessee coal fields. The lawsuits, like

the economic struggle of which they are a part, have been long and hard fought. The issues here involved are basic issues. They involve a basic commodity in the American economy—coal. They involve basic principles of American labor-management relations—the manner in which labor and management may lawfully seek their respective aims and goals. They involve basic principles of American law—the extent to which Federal Antitrust Laws shall regulate the activities of labor unions.

The original action, in Docket No. 3667, purported to have been brought as a class action, some 27 individuals, partnerships and corporations joining as plaintiffs. As originally filed, the lawsuit named a number of parties as defendant, including United Mine Workers of America, the Trustees of the United Mine Workers of America Welfare and Retirement Fund, the West Kentucky Coal Company, Inc., Cyrus W. Eaton, the Tennessee Valley Authority, G. O. Wessenouer, manager of power for the T.V.A., and The Louisville and Nashville Railroad Company. Along the way plaintiffs were added and plaintiffs dropped out or were dismissed from the suit so that, at the time of the trial, some 16 individuals, partnerships and corporations remained as parties plaintiff. Also along the way the suit was dismissed as to all defendants other than the United Mine Workers of America. In the course of the trial an additional plaintiff, Walden Ridge Coal Company, was dismissed for lack of any evidence in its behalf. Various motions were made at the trial by the defendant with respect to the right of other individual plaintiffs to maintain this suit, but action upon these individual motions was reserved for this opinion. The case was tried by the Court sitting without a jury. The trial extended over a period of weeks with a record in excess of five thousand six hundred pages having been made and four hundred fifty exhibits having been filed, many of the exhibits themselves being quite voluminous. This lawsuit has been well tried and the parties have submitted excellent briefs.

At the time the lawsuit in Docket No. 3667 was tried, there was pending upon the dockets of this court the case of Tennessee Products & Chemical Corporation v. United Mine Workers of America and West Kentucky Coal Company, Inc., Docket No. 4189. This lawsuit contained almost identical allegations of liability as were involved in Docket No. 3667. Following the trial and submission of briefs in the original action, Docket No. 3667, the parties undertook negotiations in Docket No. 4189, which negotiations eventually led to a dismissal of that action as to the defendant, West Kentucky Coal Company, Inc., and to a stipulation by the parties that the issue of liability in that case would be submitted to the Court for decision upon the record made in the trial of Docket No. 3667. This opinion would accordingly decide all issues in Docket No. 3667 but only the issue of liability in Docket No. 4189.

## SUMMARY OF CONTENTIONS

A summary of the contentions of the parties would lay an appropriate foundation for the analysis of the evidence and the factual and legal conclusions which the Court must make in deciding these cases. The Court will accordingly attempt a concise statement of the theories advanced by the respective parties.

### Plaintiffs' Contentions

The plaintiffs contend that the defendant, United Mine Workers of America (sometimes hereinafter referred to as "U.M.W.") has over a number of years now engaged in an unlawful conspiracy with certain coal operators to eliminate and suppress competition in the coal industry, to control the Southern Appalachian coal fields and to suppress or eliminate the production of coal in the Southeastern Tennessee coal fields. This conspiracy is alleged to violate Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. Sections 1 and 2). It is alleged that the major coal producers in Pennsylvania, Ohio and adjacent states, including among others Consolidation Coal Company and Island Creek Coal Company, had prior to 1950 largely domi-

nated the production and marketing of coal in the Appalachian area. This domination was threatened by the rise of small independent producers during and following World War II. By 1949–1950 the coal industry in America was confronted with a problem of over production. Thereupon, commencing with the National Bituminous Coal Wage Agreement of 1950, the U.M.W. combined and conspired with major coal companies to force uniform wages which only the larger companies could meet on all coal producers in the nation, including those in marginal seams, such as the plaintiffs, to restrain competition from those many small producers who were operating under conditions where they could not possibly perform the terms of the national contract and thus to eliminate the competition of producers from the market, thereby permitting the markets to be taken over by the major coal combines. Successive amendments to the National Bituminous Coal Wage Agreement of 1950 were negotiated between the U.M.W. and the major coal producers in 1951, 1952, 1955, 1956 and 1958 raising wages to an exceedingly high level and increasing the welfare fund royalty from 10¢ a ton to 40¢ a ton. It is alleged that these amendments were a part of the same conspiracy and in furtherance of the same monopolistic practices. The successive increases in the wage scale and welfare fund payments were designed and tailored to meet the abilities of the major coal companies to mechanize and not have their profits affected by the increasing labor costs, the U.M.W. all the while having full knowledge that the smaller companies could not pay the wage scale and royalties and would therefore fall by the wayside. It is alleged that the U.M.W. favored the coal industry being taken over by the large combines of coal producers and in furtherance of this engaged in a campaign to impose the wage contracts upon the small independent and non-union mines, this effort by the Union being particularly intense after 1950. Mob violence and terrorism were used by the Union in furtherance of

these purposes. To accelerate the demise of small companies, provisions were placed in the national contract whereby the operators agreed not to lease coal lands or purchase coal from nonsignatories to the contract. In 1958 an amendment to the contract was negotiated whereby the U.M.W. expressly agreed not to enter into any agreement with other coal operators upon any basis other than the national contract.

In the meantime, the rapid expansion of the Tennessee Valley Authority steam plant system during the 1950's, resulting in the T.V.A. becoming the largest coal purchaser in the nation, called the attention of the conspirators to the Southern Appalachian region. The U.M.W. thereupon invested over $25,000,000 in coal companies, principally the West Kentucky Coal Company, and its subsidiary, Nashville Coal Company, and these companies, along with other conspirators, adopted the practice of predatory pricing to drive the T.V.A. coal market price down to a level where small producers could not compete upon the market. Large tonnages of coal were dumped on the T.V.A. market at constantly lower prices. During the same time it is alleged that the U.M.W. sought to suppress production of coal by the plaintiffs by creating labor turmoil, violence and intimidation throughout the Southeastern Tennessee coal fields. In this manner, by reducing production in the Southeastern Tennessee coal field by labor turmoil, while at the same time forcing the T.V.A. coal market price downward, the plaintiffs were caused to lose their principal market, the T.V.A. steam plant market. The conspiracy thus manifested itself in the Southeastern Tennessee coal fields by a squeeze applied to the local operators both from the market side and from the labor side. While large producers in other fields, including companies owned by the U.M.W., applied downward pressure on the price of coal in the plaintiffs' principal market, U.M.W. sought to raise labor costs by forcing the national contract upon the plaintiffs, by interfering with production, by engaging in widespread acts of

violence and intimidation, and by closing down the Southeastern Tennessee coal fields for long periods of time by means of labor turmoil. It is alleged that the result of all of these actions has been that a large number of small coal companies, including many of the plaintiffs, have been driven out of the coal industry and large numbers of coal miners have been put out of work. Those plaintiffs who have managed to survive contend that they have been severely damaged by the defendant's monopolistic practices.

## Defendant's Contentions

The defendant denies participation in any conspiracy and denies that the plaintiffs have been the victims of any antitrust violations on the part of the defendant. On the contrary, the U.M.W. contends that the plaintiffs have been the victims of their own mismanagement, their own ineptness, their own failure and refusal to keep up with the industry, and have created their own labor turmoil, either by refusing to enter collective bargaining agreements or by refusing to abide by the terms of the agreements which they had signed. The U.M.W. contends that its activities have at all times been legitimate activities for a labor union, that it has always acted to further the best interests of its members by arms'-length bargaining with coal operators, all in accordance with federal labor laws and federal labor policy. From its inception in 1890, the U.M.W. contends that it has consistently sought to unite all workers employed in the coal industry in one organization and that it has always vigorously sought to achieve national uniformity in wages, labor standards and mine safety requirements. It has always refused to subsidize marginal operators through substandard labor conditions. It contends that the 1950 National Bituminous Coal Wage Agreement was the result of good faith collective bargaining—bargaining conducted under the strict scrutiny and supervision of federal authorities, including the federal courts. It denies any conspiracy

then or thereafter to drive any coal producers out of the industry. While not attempting to force mechanization upon the industry, the U.M.W. recognized that mechanization was the inevitable result of technological advances and of competition with other fuels and accordingly has not opposed such mechanization. On the contrary, it has sought through collective bargaining to assure that its members would share in the benefits of increased productivity. The defendant contends that all amendments to the National Wage Agreement since 1950 have likewise been the result of good faith collective bargaining and not the result of any conspiracy as contended by the plaintiffs. The U.M.W. denies that the land lease clause or the clause in regard to subcontracting was a part of any conspiracy aimed at small producers, but avers that they were solely to protect the integrity of the labor standards negotiated in the contract and to prevent signatories to the contract from using these means to escape from their obligations under the contract. The protective wage clause negotiated in 1958 was merely a commitment upon the part of the U.M.W. to enforce the contract alike on all signatories. The National Wage Agreement of 1950 and all of its subsequent amendments have been the result of good faith collective bargaining and have involved only traditional and lawful labor union aims, policies and activities.

The U.M.W. contends that loans and investments of union funds in West Kentucky Coal Company were lawful loans and investments and were for lawful purposes and were not a part of any Sherman Act conspiracy. The U.M.W. denies that it ever influenced or sought to influence the management or coal sales policies of West Kentucky Coal Company. It denies that it was in any way a party to such sales policies. Furthermore, the U.M.W. contends that West Kentucky Coal Company never sought to depress the T.V.A. market and denies that West Kentucky Coal Company ever engaged in predatory pricing of coal to the T.V.A., but contends upon the contrary

that West Kentucky Coal Company merely followed the market in submitting its bids and sought coal sales for legitimate business purposes and at legitimate business prices.

The U.M.W. contends that its activities in the Southeastern Tennessee coal fields have at all times been legitimate and traditional labor union activities and denies that they were part of any Sherman Act conspiracy. The U.M.W. contends that the plaintiffs have by their own conduct and activities fomented the labor trouble and unrest in the Southeastern Tennessee coal fields. The U.M.W. contends that despite the fact that it has at all times represented the overwhelming number of coal miners in the area, the plaintiffs have often failed and refused to negotiate collective bargaining agreements and when agreements were signed the plaintiffs have repeatedly refused to live up to the terms of their contract. The U.M.W. denies that it was in any way responsible for acts of violence or intimidation, but avers on the contrary that it always sought to restore peace and order to the coal fields and to require its members to live up to their contracts. The U.M.W. avers that the plaintiffs' failure to remain competitive in the T.V.A. coal market is the result of mismanagement, the attempt to mine coal by hand or other antiquated methods, the failure to keep abreast of modern production methods and other reasons unrelated to labor costs or union activities. The U.M.W. denies that the plaintiffs, or any of them, are entitled to recover any damages against it in these lawsuits.

## LEGAL GUIDELINES

A necessary prelude to undertaking an analysis of the record in this lawsuit is a review of the federal antitrust laws and their application to labor unions. This lawsuit is founded upon Sections 1 and 2 of the Sherman Act wherein it is declared that "every contract, combination * * * or conspiracy, in restraint of trade or commerce * * * is * * illegal * * * " and "every person who shall monopolize or attempt to monopolize * * * or conspire with any other person * * * to monopolize any part of the trade or commerce * * * " shall be guilty of a violation of antitrust laws. (15 U.S.C., Sections 1 and 2)

The Sherman Act "was enacted in the era of 'trusts' and 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition on the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." Apex Hosiery Co. v. Leader, 310 U.S. 469 at 492, 60 S.Ct. 982, 84 L.Ed. 1311 at 992 (1940). The Act was not long in being applied to labor union activities. In 1908 the Supreme Court in Loewe v. Lawler, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, held that the use of a secondary boycott by a union, directed at eliminating sales of non-union goods, in an effort to compel an employer to unionize his shop was a combination in restraint of commerce within the purview of the Sherman Act. This view of the matter was shortly changed by Congress, when in 1914 it amended and supplemented the Sherman Act with the Clayton Act. Section 6 of the latter Act established as national policy the exempting of labor unions from the Sherman Act:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor * * organizations * * * or to forbid * * * such organizations from lawfully carrying out the legitimate objects thereof * * * " (15 U.S.C., Sec. 17)

By 1921 the Supreme Court in Duplex Printing Press v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, had interpreted the language of Section 6 of the Clayton Act as granting no immunity from antitrust liability "where (unions) depart from normal and legitimate objects * * * " *Duplex*, and the line of cases following it, was met by further Congressional action in 1932 with pas-

sage of the Norris-LaGuardia Act (29 U.S.C. § 101 et seq). While worded as a restriction upon the use by federal courts of injunctions in cases growing out of labor disputes, it was soon recognized by the Supreme Court as having as its purpose the "underlying aim * * * to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated". United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788. By establishing the national labor policy in subsequent labor legislation (i. e., the National Labor Relations Act, the Labor Management Relations Act and the Labor-Management Reporting and Disclosure Act of 1959), Congress has further defined and restricted the scope of antitrust application to labor union activities. The problem for the courts in this area has come to be the reconciliation of two declared Congressional policies, one seeking to preserve a competitive business economy and the other seeking to preserve the rights of labor to organize and seek to better conditions of employees through collective bargaining.

The modern phase of the law in this respect may be said to have begun with the case of Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311. There the Court was confronted with an antitrust action predicated upon union violence in the course of a strike occasioned by an organizational dispute. In construing the substantive reach of the Sherman Act, the Court held that the statute was not intended to cover any activity, by a labor union or anyone else, unless it had or was intended to have a substantial effect upon "commercial" competition, such as by restricting production or prices or otherwise impairing free competition on the market. Furthermore, even where commercial competition was affected, "an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act." Id. at 503, 60 S.Ct. at 997. The scope of labor's antitrust exemption thus became relevant only if its acts had the purpose or effect of injuring commercial competition in the market place, as distinguished from the labor market.

Next came United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, where the Court addressed itself specifically to the labor union exemption from the antitrust laws as contained in the Clayton Act and the Norris-LaGuardia Act. The Court found that a strike and economic boycott were expressly exempt from Sherman Act liability, even though the union's dispute was essentially jurisdictional rather than with the injured employer. "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." Id. at 232, 61 S.Ct. at 466.

In 1945 the case of Allen Bradley Co. v. Local 3 I. B. E. W., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, was decided. There the union had obtained an agreement whereby all electrical contractors were to purchase electrical equipment exclusively from local manufacturers employing union labor. The manufacturers in turn agreed to sell only to contractors who employed union members. The Court held that Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create such monopolies or control the marketing of goods and services. The Court concluded that "When the unions participated with a combination of businessmen * * * to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts". Id at 809, 65 S.Ct. at 1540.

Of controlling significance to the issues of the present lawsuit is the recent

case of United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626. The theories of the parties and the issues there involved bear a close similarity to the theories and issues here involved. Upon the same day the Supreme Court also decided the case of Local Union No. 189, etc. Meat Cutters Union v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640. These cases must be read together to understand their full import. Even then some uncertainty as to the full import must persist, as these cases produced five separate opinions expressing differing views. In *Pennington* the U.M.W. had sued a coal producer from the Northern Tennessee coal field for welfare fund payments. Pennington counterclaimed, alleging that the union had violated the Sherman Act by conspiring with certain large coal companies to drive smaller mine operators, including the defendant, from the coal industry. A verdict was returned against the U.M.W. Upon appeal the Supreme Court denied the U.M.W.'s claim to exemption from the antitrust laws for its activities.[1] The relevancy of the case to the issues here involved can best be stated by quoting the following excerpts from the opinion of Mr. Justice White, who wrote for a majority of the Court:

> "We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior.[2] But we think a union forfeits its exemp-

tion from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. * * *

\* \* \* \* \* \*

" * * * This Court has recognized that a legitimate aim of any national labor organization is to obtain uniformity of labor standards and that a consequence of such union activity may be to eliminate competition based on differences in such standards * * * But there is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry * * * "

\* \* \* \* \* \*

" * * * The policy of the antitrust laws is clearly set against employer-union agreements seeking to prescribe labor standards outside the bargaining unit."

\* \* \* \* \* \*

" * * * all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, without regard to predatory intention or effect in the particular case. For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy * * * After the agreement the union's interest would be bound in each case to that of the favored employer group.

---

1. The case was reversed upon the ground that the trial court had failed to correctly instruct the jury that any concerted union-operator effort to influence public officials with regard to minimum wages or other matters was exempt from the Sherman Act regardless of the intent or purpose of such effort.

2. Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though

it may suspect that some of employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy.

It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy."

The *Jewel Tea* case followed a somewhat different aspect of the labor union exemption from the Sherman Act. There the employer, Jewel Tea Company, challenged the validity of a clause in its collective bargaining contract which prevented it from operating its meat counters after six o'clock in the evening or before nine o'clock in the morning. The plaintiff had agreed to the marketing-hours restriction only after threat of a strike. The trial court expressly found that, while some 9,000 other meat retailers had agreed to the marketing-hours restriction, the union had formulated the restriction and pursued its adoption alone and to serve its own interests. Adopting the trial court's finding that no union-employer conspiracy existed, Mr. Justice White stated:

"The issue in this case is whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the union's successful attempt to obtain that provision (unilaterally) * * * falls within the protection of the national labor policy * * * The concern of union members is immediate and direct."

The opinion concluded that a meat market's hours of operation was so closely related to "wages, hours and working conditions" as to be within a mandatory subject of bargaining under federal labor laws and thus within the labor union exemption from the Sherman Act.

■ Extracting what appears to be the majority opinion of the Court in both the *Pennington* and *Jewel Tea* cases, the rule would seem to be that a labor union is exempt from the operation of the federal antitrust laws provided that it acts unilaterally, in the pursuit of its own self-interests rather than in combination or conspiracy with non-labor groups and provided further that its activities be in furtherance of a subject matter of immediate and legitimate union concern, such as wages, hours and working conditions, and not in furtherance of matters which are only of indirect concern to the union, such as prices and other marketing factors.

A more difficult problem is posed in attempting to extract from *Pennington* and *Jewel Tea* a statement of the present status of the rule with respect to antitrust liability of a labor union where the exemption does not apply. In his concurring opinion in *Pennington*, Justice Douglas appears to have read the majority opinion as holding that an industry-wide collective bargaining agreement which exceeds the ability of some employers to conform is prima facie evidence of a forbidden conspiracy, that is a conspiracy whose purpose is to force some employers out of business. While Justice Douglas would require proof of predatory intent, i. e. that the purpose was to force some employers out of business—the prima facie rule suggested by him and concurred in by two other justices does not appear to have received support either in the opinion of Justice White or the dissenting opinion of Justice Goldberg. On the contrary, Justice White expressly held that a union, provided that it acts unilaterally, may lawfully adopt a uniform wage scale even though it may suspect that some employers could not pay the scale and continue to compete. Justice Goldberg would hold any union agreement relating to a mandatory subject of collective bargaining, such as wages, should be immune from antitrust liability regardless of the economic consequences involved. To hold that a union, in doing what it lawfully is entitled to do thereby creates a prima facie case of illegal activity is a contradiction in terms. The opinions of Justice White and Justice Goldberg between them obtained the concurrence of six members of the Court. On the other hand, Justice White used language in his opinion in the *Pennington* case that would support a rule that no proof of predatory intent is required once it has

been established that a union has lost its exemption by entering an agreement with one group of employers to seek specified labor standards from another set of employers not included within the bargaining unit. As stated by Justice White:

"From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, *without regard to predatory intention or effect in the particular case.*" (Emphasis added.)

If it was the intent of the foregoing language to remove the usual rule of reason applied in antitrust cases and substitute a per se rule, either with regard to the specific circumstances described or with respect to all cases in which the union is found to have lost its antitrust exemption, it would appear that the opinion is not supported by a majority of the Court. Neither the concurring opinion of Justice Douglas nor the dissenting opinion of Justice Goldberg supports such a per se rule. The opinions of Justice Douglas and Justice Goldberg between them obtained the concurrence of six members of the Court.

By way of summary, while Justice White would require proof of the conspiracy between the union and the favored employers, he would appear to require no proof that the purpose was to put other employers out of business. On the other hand, Justice Douglas would require that it be made to appear that the agreement was "made for the purpose of forcing some employers out of business," but he would hold that any industry-wide collective bargaining agreement setting a wage scale that exceeded the financial ability of some employers to pay creates a prima facie case of conspiracy. Neither the per se rule of Justice White nor the prima facie rule of Justice Douglas appears to have received the support of a majority of the Court.

 Turning now to other matters, the first and second sections of the Sher-

man Act embrace "every conceivable act which could possibly come within the spirit or presence of the prohibition of the law, without regard to the garb in which such acts are clothed". United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. There is excepted from this broad statement of the rule activities seeking to influence governmental action, whether such activities are in concert with others or not and regardless of the motive or purpose that may have prompted such activities. Activities so directed are embraced within the constitutional right to petition governmental authority and are absolutely privileged from any antitrust consequence. Eastern Railroad Conference v. Noerr Motors, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464; United Mine Workers v. Pennington, supra. Evidence of such activity may nevertheless be competent to show the purpose and character of prior or subsequent conduct.

 The U.M.W. is here charged with a Sherman Act conspiracy. In this respect a conspiracy may be defined as a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; National Fireproofing Co. v. Mason Builders Association, 2 Cir., 169 F. 259, 26 L.R.A.,N.S., 148. It is not the form of the combination nor the means used, whether lawful or unlawful, but rather it is the anticompetitive result that the statute condemns. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum total of acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

 The character and effect of a conspiracy are not to be judged by dismembering the conspiracy and viewing its separate parts, but rather by looking at the evidence bearing upon the con-

spiracy as a whole. As stated by the Court in Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777:

"In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ' * * * (T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. United States v. Patten, 226 U.S. 525, 544 [33 S.Ct. 141, 57 L.Ed. 333] * * *; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.' American Tobacco Co. v. United States, 147 F.2d 93, 106 (C.A.6th Cir). See Montague & Co. v. Lowry, 193 U.S. 38, 45–46, [24 S.Ct. 307, 309] 48 L.Ed. 608, 611, 612."

■ One further subject needs to be given attention here and that is the standard of proof that must govern a proceeding involving a Sherman Act charge against a labor union. The burden of proof borne by the plaintiff is not the usual preponderance of the evidence rule applicable in civil cases generally. The requirement imposed by Section 6 of the Norris-LaGuardia Act is that of "clear proof" where a labor organization is a party to an action such as this. (29 U.S.C. § 106)

In a recent case arising from this district, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, Justice Brennan, in writing the opinion of the Court, had this to say with respect to the meaning of the "clear proof" rule established by Section 6 of the Norris-LaGuardia Act:

"Although the statute does not define 'clear proof,' its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as 'clear, unequivocal, and convincing proof.' Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.' Schneiderman v. United States, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796, 1802."

That the "clear proof" standard applies to an action wherein a labor organization is sought to be charged with a Sherman Act violation appears settled. United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. See also Lewis v. Pennington, 257 F.Supp. 815 (D.C.E.D.Tenn., 1966).

### PARTIES

An identification of the parties plaintiff in these lawsuits and of the coal mining operations conducted by each, as well as an understanding of their relationship to one another, will be helpful at this point. Two companies control the major portion of the coal mining lands in the Southeastern Tennessee coal field. These two companies are Tennessee Products & Chemical Corporation (Tennessee Products) and Tennessee Consolidated Coal Company (Tennessee Consolidated). Tennessee Products is the party plaintiff in one of these lawsuits (Docket No. 4189). Tennessee Consolidated is not a party, but has a lawsuit pending in this court seeking similar relief (Docket No. 4178).

Tennessee Products was formed during World War I. It conducts a diversified operation in which coal mining is one part. It entered the Southeastern Tennessee coal field in 1938. In 1954 it became a wholly owned subsidiary of Merritt-Chapman & Scott, itself a national enterprise with diversified interests. Tennessee Products conducts its coal mining operations on 24,075 acres of land in the Southeastern Tennessee

coal field leased to it by the Tennessee Coal & Iron Division of the United States Steel Corporation (T.C.I.). T.C.I. receives a royalty of 17¢ per ton for all coal mined and receives a minimum guaranteed payment of $5,000.00 per month whether coal is mined or not. Tennessee Products is required to report and account for its mining operations each month, including those of any subcontractors.

Prior to World War II Tennessee Products operated one large hand loading mine. During and following the war a number of small truck mines were opened so that by January 1956 more than 100 such small mines were being operated. Most of them, and eventually all of them, were subleased. In 1956 the small mines produced 1,189,763 tons as compared with 396,383 tons for the large mine operated by Tennessee Products.

Tennessee Consolidated, while not a party to this lawsuit, is frequently referred to in the record. It was formed in 1905 and is principally owned and operated by two families, the Hamptons and the Roberts. It owns some 50,000 acres of land in Southeastern Tennessee, of which 38,700 acres are coal bearing. The same interests which own Tennessee Consolidated also own Whitwell Coal Company (Whitwell), although in different proportions, with Tennessee Consolidated itself being the largest stockholder in Whitwell. Whitwell acts as a sales agency handling bids to the Tennessee Valley Authority (T.V.A.) for the truck mines operating as lessees of Tennessee Consolidated property. For a time Whitwell conducted a strip and auger mining operation with equipment leased from Tennessee Consolidated. Grundy Mining Company (Grundy) is a wholly owned subsidiary of Tennessee Consolidated formed in 1959. After 1959 Grundy was the coal mining company for these related enterprises, leaving Tennessee Consolidated in the status of a land company.

In 1940 Tennessee Consolidated subleased a large portion of its coal lands to the A. L. Henderson lease, a partnership made up of stockholders and officers of Tennessee Consolidated. The A. L. Henderson lease in turn subleased to a number of small truck mine operators, who paid royalty to the Henderson partnership and sold their coal through the Whitwell Coal Company.

Both Tennessee Products and Tennessee Consolidated maintain a number of truck mine operations on their respective properties. These truck mines operate under lease, some leases being verbal and others in writing. Some leases are from month to month, some from year to year, and others for longer terms. Tennessee Products and Tennessee Consolidated receive royalties from the lessees in varying amounts, such as 25¢ to 60¢ or more, for coal extracted and received additional sums for insurance, engineering, sales and coal handling charges and mine supervision in some instances. There appears to have been considerable shifting of lessees and leasehold interests during the period here under consideration. It is these lessees from Tennessee Products and Tennessee Consolidated that constitute the major number of plaintiffs in Docket No. 3667. Some of the lessees operate one mine, some more than one, and some do not mine at all but sublease to or subcontract with others. Some truck mines operate in the workings of abandoned major mines and rob the remnants; others work in virgin coal land. On the average, it appears that truck mines work out their leasehold in from two to five years.

Mining methods in the truck mines run the gamut from primitive to advanced methods of mining. Some operators shoot from the solid, load coal by hand and haul it to the tipple by mule. Others are substantially mechanized, using cutting machines, mobile loaders and continuous hauling from the face by chain conveyor or rubber tired shuttle cars. Many operate between these ranges.

Among the plaintiffs in Docket No. 3667 there are three exceptions to the foregoing leasing arrangements. One of these is George Ramsey; another is the

J. H. Graham Coal Company, Inc.; the third is East Valley Coal Company.

George Ramsey is an individual doing business as Ramsey Coal Company. He conducts a strip mine operation, the only such operator among the plaintiffs. He commenced coal stripping operations in the 'Southeastern Tennessee coal fields in 1951. Originally he leased coal lands, but later purchased land and his operation has grown from a two or three man operation to one employing some 20 or more men.

J. H. Graham Coal Company, Inc., is a corporation organized by J. H. Graham, W. J. Travis and W. T. Morrison in 1958 and 1959. It has six rather small mines upon leased lands near Spring City, Tennessee. All of these were either subcontracted or subleased.

East Valley Coal Company was commenced in 1950 by Edward Nunley, the business being incorporated in 1957. This company operated a hand loading mine on the Prentice Cooper State Forest lands. Nunley, as noted below, also leased a mine from Tennessee Products in his individual name.

Of the remaining plaintiffs, ten were lessees of Tennessee Products and two were lessees of Tennessee Consolidated. A brief description of the remaining plaintiffs and their operations is as follows:

*Tennessee Products Lessees:* (a) Leon Nunley, an individual operating as the Leon Nunley Coal Company, commenced in 1953 and operated two hand loading mines. In 1959 he moved to another mine and set up a partially mechanized operation.

(b) Edward Nunley, an individual operating as the Edward Nunley Coal Company, commenced in 1955 with a single mine which he subcontracted to another to operate while he hauled coal.

(c) Paul Gibbs, an individual operating as the Paul Gibbs Coal Company, commenced in 1953 on Tennessee Products land. He had several hand loading mines, some of which he operated and others of which he subcontracted the operation while he hauled coal.

(d) The Ninth West Coal Company was a partnership organized in 1955 by W. J. Travis and J. H. Graham. It was incorporated in 1962. This company leased a number of truck mines in the Whitwell area which it subcontracted to various individuals to operate. All but one of these mines were hand loading mines.

(e) The A & R Coal Company, Inc., was a corporation formed by Allen Johnson and Richard Johnson, but later sold to J. H. Graham and W. J. Travis. It operated a mechanized truck mine in 1959 and 1960 in the Daus Mountain area.

(f) The M & T Coal Company was a partnership organized in 1953 by W. T. Morrison and W. J. Travis. It subleased mines in the Whitwell area from Tennessee Products which it in turn subcontracted to various individuals to operate. These were hand loading, non-mechanized mines.

(g) The M & G Coal Company was a partnership formed in 1958 by W. T. Morrison and J. H. Graham. It took over the mines of the M & T Coal Company. It had leases from Tennessee Products on hand loading mines in the Whitwell area, which mines it subcontracted to others to operate.

(h) Stephenson Brothers Coal Company, Inc., was organized in 1959 as the successor to a partnership between John Stephenson and Howard Stephenson, who had operated mines since 1946. This coal company leased a number of mines in the Mount Olive (Whitwell) area from Tennessee Products and operated some of the mines and subcontracted others. Coal was hand loaded in these mines.

(i) Lon Varnell, an individual doing business as the Tracy City Coal Company, leased a mine in 1959 from Tennessee Products. The mine was opened as a hand operated, non-mechanized mine, but later was partially mechanized with cutting machines and locomotives,

but continued to load coal by hand. The operation of the mine was subcontracted first to Barney Johnson and Hembree Brown and later to Stanley Yarworth and Herman Johnson.

(j) Marshall Meeks leased mines from Tennessee Products commencing in 1954. Originally he subcontracted the operation of these non-mechanized mines, while he hauled coal. In 1959 he leased a mine which he mechanized and thereafter operated himself.

*Tennessee Consolidated Lessees:* (a) Howard Higgins subleased a mine in the Floyd Hollow area from the A. L. Henderson partnership, which partnership had in turn leased from Tennessee Consolidated. This was a hand operated mine. In 1958 the business was incorporated as the Howard Higgins Coal Company, Inc., to admit as silent partners two officials of Tennessee Consolidated who were later forced to withdraw, however, as their interest was discovered. In 1961 the Henderson lease was cancelled and Higgins leased directly from Tennessee Consolidated and operated the mine himself.

(b) The H. W. Flynn Coal Company, Inc., was organized in 1958 as the successor to Howard Willis Flynn, an individual. It subleased from the A. L. Henderson partnership, who in turn leased from Tennessee Consolidated. After cancellation of the Henderson sublease in 1961, it leased directly from Tennessee Consolidated. During all of the time it operated a hand loading, non-mechanized mine.

### Defendant

The United Mine Workers of America is an international labor union first organized on January 25, 1890. It was organized to unite all workers employed in the mining and related industry. The highest official body of the Union is the International Convention which met every two years, but since 1942 has met every four years. In between conventions the International Executive Board of the Union has supreme authority. With respect to collective bargaining agreements between international conventions, an International Policy Committee or "Scale Committee" was established and any collective bargaining agreement negotiated by the national officers must have the approval of this committee. The International Union is divided into districts with each district being entitled to a member on the International Executive Board. Some districts are autonomous and elect their officers. Others are provisional and their officers are appointed by the International President, subject to the approval of the International Executive Board. District 19, U.M.W., which has jurisdiction over the Southeastern Tennessee coal fields and has headquarters located in Middlesboro, Kentucky, is a provisional district. Its president, vice president and secretary-treasurer are all appointed by the International President. The District President in turn appoints the field representatives and organizers who work in the field in cooperation with local unions. John L. Lewis served as President of the International Union from 1920 until 1960 and has been President Emeritus since that time. Thomas Kennedy was President of the International Union from 1960 until his death in 1962. W. A. Boyle then became acting president and was elected President of the International Union in 1963. He has continued to serve in that position until the present time.

### 1950 NATIONAL BITUMINOUS COAL WAGE AGREEMENT

As noted above, the plaintiff contends that the antitrust conspiracy herein sued upon commenced with the negotiation by the U.M.W. of the 1950 National Bituminous Coal Wage Agreement. The defendant denies this and contends that the 1950 Agreement was but a continuation and partial realization of the legitimate labor union aims and policies which it had pursued since its organization in 1890. An analysis of the evidence must accordingly be made both with respect to pre-1950 collection bargaining between the U.M.W. and the coal operators and

the bargaining culminating in the 1950 Agreement.

### Pre-1950 Collective Bargaining

Industry-wide collective bargaining in bituminous coal mining had its beginning as far back as 1886 when a joint conference was initiated between the operators and miners of Ohio, Indiana, Illinois and Pennsylvania. The area covered by the joint conference has varied somewhat from time to time through the years and the tonnage represented has varied from 40% to 70% of the total national production of bituminous coal. This area has often been referred to as the "Central Competitive Field" and collective bargaining in the industry has been characterized by the fact that wage rates fixed in the central competitive field has substantially affected, if not largely determined, wage rates in all other bituminous coal fields in the United States.

It appears clear from the evidence that national uniformity in wage rates and labor standards in the coal industry has been a consistent policy and goal of the U.M.W. since its inception in 1890. The removal of differences in labor standards and wage rates as an element of competition within the bituminous coal industry has been the core of U.M.W.'s policy throughout the years of its existence. Wage cutting to meet price competition has been consistently opposed by the Union as being self-defeating in that it "generates a corresponding reduction in every other competitive coal field". Almost every International Convention has urged a uniform work day and a uniform wage scale in all classes of the same labor. Although sectional and regional differences in wages have historically existed in the coal industry, their elimination has been the uniform policy of the U.M.W.

In the early days an effort was made by the U.M.W. to arrive at a wage base in the central competitive field that would then become the guideline of the various "outlying districts" as most fields outside the central competitive field were called. Slow but steady collective bargaining process appears to have been made by the Union until 1924. In that year a contract was negotiated at Jacksonville, Florida, (the "Jacksonville Agreement") with the central competitive field. The agreement sought to hold the line on wages by extending the existing scale of wages for a period of three years. Some outlying districts refused to go along, however, and severed relations with the U.M.W. In the competition that resulted, operators in other districts, including the central competitive field, renounced their contracts. Collective bargaining was substantially curtailed and contracts ignored. Prices and wages went down and there was a general breakdown in the economic structure of the industry. The plight of the industry continued in this direction until 1933 when the industry was in a virtual state of chaos.

It should be noted here that early in the history of the industry there developed two methods of determining wage rates, one being a "tonnage rate" generally paid to those whose production could be measured in tonnage, and a "day rate" for all other workers. Sectional and regional differences in both of these rates existed from the beginning. By 1933 there was little or no uniformity in wages even within districts. For example, in Western Pennsylvania wages varied from $3.50 per 10-hour day to $1.50 per 12-hour day for the same job classification. In 1933 the Federal Government stepped in with the N.R.A. and sought to impose codes of fair competition on the industry. The codes recognized wage differentials between districts, but not within districts. Also, in 1933 a collective bargaining agreement was negotiated (the "Appalachian Agreement") between the U.M.W. and operators representing approximately 72% of the national tonnage. The Appalachian Agreement established a day rate differential of 40¢ in favor of the Southern West Virginia, Eastern Kentucky, Virginia and Tennessee. Similar differentials in tonnage rates were also recognized.

Further efforts to stabilize coal marketing and production led to the passage of the Guffey Act by Congress. The purpose of this legislation was to establish codes on pricing, but the increasing demands for coal in the approaching World War II period led to the repeal of the Act.

In the Appalachian Conference of 1941, the U.M.W. demanded elimination of both the tonnage differential and the day rate differential between northern and southern coal fields. The Conference split over these negotiations, with the southern operators withdrawing. An agreement was then concluded with the northern operators eliminating the 40¢ daily wage differential, but the Union dropped the demand for elimination of the tonnage rate differential. The Union, however, agreed upon a "favored nation" clause which committed it to grant to the northern operators any more favorable terms than were negotiated by the Union with the southern operators. This insured elimination of the 40¢ differential in event a contract was negotiated with the southern operators. In negotiations with the southern operators this issue went to the National Defense Mediation Board and it recommended elimination of the 40¢ differential. The recommendation was accepted by the southern operators. The elimination of the 40¢ differential in 1941 did not completely eliminate the differential that had existed in the Southeastern Tennessee coal field, which differential continued to amount to 23¢ per hour on the day rates. A tonnage rate differential of 3¢ to 15¢ per ton also continued to exist. The $16.25 per wage day increase negotiated between 1945 and 1965 has been added across the board on the rates existing in 1941. Thus, a slight differential continues to exist in favor of the Southeastern Tennessee coal fields, although substantial reduction in the number of employees paid on a tonnage basis caused by mechanization and flat across-the-board wage increases have reduced the differentials to minimal significance. While differentials still exist, U.M.W. has virtually accomplished its historic policy of wage uniformity.

The period from 1943 through 1948 was a turbulent time indeed in the history of collective bargaining in the coal industry. A detailed account of these troubled times has been placed in the record, but it would serve little purpose to recount these details here. Suffice it to say that although wage increases were negotiated and the welfare fund was established during this period, there were seven national strikes or work stoppages during the period, accompanied by five Federal Government seizures and operation of the mines, and two Taft-Hartley boards of inquiry certifying the necessity of miners returning to work. In addition, there were injunctive, contempt and unfair labor practice charges and proceedings against U.M.W. by both the Federal Government and the coal operators alike. In 1946 criminal and civil contempt fines of $3,500,000.00 and $10,000.00 were imposed upon the Union and its President respectively. The Supreme Court affirmed these fines after reducing the $3,500,000.00 to $700,000.00. In 1948 contempt fines totalling $1,420,-000.00 were imposed upon the Union and its President.

It was during the period of government seizure and operation in 1946 that the U.M.W. Welfare and Retirement Fund was first established, the agreement sometimes being referred to as the "Krug-Lewis Agreement". A royalty of 5¢ per ton was established to finance the Fund.

Adding to the problems of the industry was the fact that in the post-war years a slackening of demand for coal produced a coal surplus. The market was shifting during this period, not only to other fuels but also within the coal industry. Whereas the Class I mines (those producing in excess of 500,000 tons per year) had supplied approximately 50% of the market during the war years, with the drop in demand for coal following the war, their share of the market dropped to 41.5% in 1947, 38% in 1948, and 29.3% in 1949.

### 1950 Collective Bargaining

The plaintiffs lay substantial emphasis upon statements made by John L. Lewis at the 1948 U.M.W. International Convention as being indicative of the conspiratorial motives or purposes then upon the Union's mind. These statements relate to the unstable condition in the bituminous coal industry, the problem of over production, the failure of management to give any unified or stabilizing leadership to the industry and the suggestion that "If the operators of this country cannot give any leadership upon the commercial side of this industry, the United Mine Workers of America can and will". Mr. Lewis then suggested the three-day work week as a means of equitable distribution of work opportunities. The significance of this can only be judged in the light of all of the evidence, particularly that related to the 1950 contract negotiations.

The 1948 collective bargaining agreement expired or was terminated by its terms on June 30, 1949. Negotiations were held in three separate conferences: one at Bluefield, West Virginia, with the Southern Coal Producers' Association; a second at White Sulphur Springs, West Virginia, with northern operators; and a third with captive mine owners. These negotiations went on from May through November with no results. Following termination of the 1948 agreement and throughout the prolonged negotiations for a new contract, the Union applied a three-day work week east of the Mississippi River. The Union contends that this was merely a bargaining device in the nature of a limited strike. The plaintiffs contend that it demonstrated a Union concern to share the work opportunities among its members, which concern was surrendered by the Union as a part of the conspiracy with the northern operators which culminated in the 1950 National Bituminous Coal Wage Agreement.

There is nothing in the record, however, to indicate that the three-day work week was anything other than a bargaining technique. Its continuance was never an issue bargained for. Rather, the bargaining centered around the union shop, the limitation of welfare fund benefits to U.M.W. members and the clauses giving the Union control over working time, that is the so-called "able and willing" and "memorial period" clauses. The deadlock on these issues resulted in a Taft-Hartley injunction against the Union. A further injunction, brought at the instance of the Federal Government under the National Emergency Provision of the Taft-Hartley Act, ordered the Union to bargain in good faith. A contempt action thereunder was eventually brought against the Union and its President. It was under these conditions, and in compliance with these injunctions, and within two days after the President of the United States had asked Congress for legislation to permit seizure of the mines, that an agreement was finally concluded with the northern operators on March 5, 1950—an agreement known as the "National Bituminous Coal Wage Agreement of 1950". In short, the 1950 Agreement was negotiated under intense national interest, intense publicity, and intense supervision by and pressure from the Federal Government.

It is this agreement that the plaintiffs contend was the inception of the conspiracy between the U.M.W. and certain large coal operators to eliminate or suppress competition from the small coal operators. It is alleged that the wage scale and welfare fund royalties were set at a level so high that only the large mechanized mines, or mines readily capable of being mechanized, could meet them.

 It is true that the 1950 Agreement was negotiated between the Union and the northern operators, with the representatives of the large mining interests being the chief negotiators for the operators. It is also true that the Court must consider the evidence as a whole and not fragment the 1950 negotiations from the evidence as a whole in determining the existence of an antitrust conspiracy. The Court can only say that upon the evidence to this point, it can discern no evidence of any incipient Sher-

man Act conspiracy. Certainly the testimony of the principal negotiators for both the Union and the operators is emphatic to the contrary. To conclude inferentially otherwise on the basis of the wage scale negotiated is to engage in unwarranted speculation and is to disregard the undeniable right of the Union to seek to gear its wage scale to the ability to pay of the soundly solvent and not the marginal producer, of the ability to pay of the stronger and not the weaker coal operators. As stated by the United States Supreme Court in the case of United Mine Workers v. Pennington, 381 U.S. 657 at 665, 85 S.Ct. 1585, at 1591, 14 L.Ed.2d 626.

> "The union need not gear its wage demands to wages which the weakest unit in the industry can afford to pay."

To conclude inferentially otherwise on the basis of statements of Union officials and operator spokesmen favoring stability in the industry is to equate stability to a Sherman Act conspiracy and instability to Sherman Act policy. The circumstances of the negotiations as outlined above give no support in reason to such a conspiratorial inference. Rather, quite to the contrary.

### COLLECTIVE BARGAINING FOLLOWING 1950

But, as correctly urged by the plaintiffs, the picture must be viewed as a whole, and not in isolated segments. The developments following 1950 must now be looked to, for the picture on the national scene took a much more tranquil course than in the turbulent 1940's. In June of 1950 the Bituminous Coal Operators Association (B.C.O.A.) was formed as a collective bargaining agency for the operators. At one time a total of 262 individual coal companies were included within its membership. These included the largest in the industry. They also included the smaller, for approximately one-half of the member producers produced less than 100,000 tons of coal a year. Those who stayed out did so by choice and not by reason of any exclusionary rule. The B.C.O.A. represented for bargaining purposes approximately one-half of the tonnage of bituminous coal mined in the United States. In evaluating the relationship of the B.C.O.A. to any alleged Sherman Act conspiracy, it should be noted here that of the alleged co-conspirators, namely Peabody Coal Company, Consolidation Coal, Island Creek Coal Company, West Kentucky Coal Company, Nashville Coal Company, Pittston Coal Company, and Pittsburgh-Midway Coal Company, only two were B.C.O.A. members, namely Consolidation and Pittston.

The 1951 amendment to the National Bituminous Coal Wage Agreement was negotiated between the Union and B.C.O.A. with a minimum of publicity and without any outward signs of industrial warfare. It is suggested that a new "two-man" bargaining technique was worked out between John L. Lewis, for the Union, and Harry Moses, for the B.C.O.A. It appears, however, that the Union Policy Committee, as well as the corresponding B.C.O.A. negotiating committee, played a part, albeit a less public and less prominent role than in prior negotiations.

The 1951 amendment provided for an increase of $1.60 per day in wages. The 1952 U.M.W.–B.C.O.A. negotiations followed much the same pattern as the 1951 negotiations. The 1952 amendment increased wages by $1.90 per day and increased the welfare fund payment from 30¢ to 40¢ per ton, where it has since remained. (The welfare fund royalty had been established at 5¢ per ton in 1946, raised to 20¢ in 1948 and to 30¢ in the 1950 contract.) The 1955 amendment provided for a two-step wage increase totalling $2.00 per day and vacation pay was increased from $100.00 to $140.00. The 1956 amendment provided for another two-step wage increase totalling $2.00 per day and an increase in vacation pay from $140.00 to $180.00, as well as a three-day Christmas vacation with a $40.00 payment.

The negotiations of the amendments in 1952, 1955 and 1956 likewise followed much the pattern of the 1951 negotia-

tions between U.M.W. and the B.C.O.A. That these more peaceful procedures suggest a Sherman Act conspiracy, however, is not reasonably to be inferred. Certainly no such clear inference can be drawn from the evidence. A contrasting peaceful and orderly pattern of collective bargaining following a prior pattern of industrial warfare and strife does not become suspect nor serve as an evidentiary predicate for a Sherman Act conspiracy charge. The Court can read no Sherman Act conspiracy into the U.M.W.–B.C.O.A. negotiations in 1951, 1952, 1955 and 1956.

It does appear that following the negotiations of the National Bituminous Coal Wage Agreement of 1950, the Union had in fact, if not in theory, nothing but the national contract and its amendments to offer to any other bargaining unit. Whether the Union was free, contractually or otherwise, to negotiate any other contract is a matter not yet considered. But that it was lawfully permissible for the Union to pursue such a course of wage and labor standards uniformity, so long as it did not do so conspiratorily with a segment of the industry cannot be doubted. United Mine Workers v. Pennington, supra. Neither the nature of the competition, the coal seam characteristics, the comparative adaptability to mechanization, nor other factors enhancing the problems of marginal coal producers can compel wage differentials nor form a basis for a court altering the legislatively permissible labor union policy of national wage uniformity. The designation of the contract as a "national" agreement does not impute to it an antitrust character under existing law as it pertains to labor unions.

That the wage scales established in the 1950 National Bituminous Coal Wage Agreement were conducive to the mechanization of coal mines cannot be doubted. That some coal operators were better able to bear the cost of mechanization and that some mined coal deposits more suitable to mechanization than others likewise cannot be doubted. To conclude, however, that the wage scales negotiated in the national contract and its amendments were tailored to further an unlawful conspiracy to suppress or eliminate competition in the coal industry can be doubted. In this regard it is proper to note that wage increases in the bituminous coal industry in the post-war period have not been out of line with wage increases in other basic industries. In fact, there were fewer increases in the coal industry from 1950 through 1958 than in the steel, automotive, copper, rubber and oil industries. The average weekly earnings of bituminous coal miners, compared with that of two other basic industries, in 1950 and in 1964 were as follows:

| Industry | 1950 Average Weekly Earnings | 1964 Average Weekly Earnings |
| --- | --- | --- |
| Bituminous Coal | $67.46 | $133.27 |
| Motor Vehicles | 74.85 | 137.70 |
| Steel | 67.95 | 138.77 |

Likewise, the hourly earnings of coal miners as compared with workers in the same industries were as follows:

| Industry | 1950 Average Hourly Earnings | 1964 Average * Hourly Earnings |
| --- | --- | --- |
| Bituminous Coal | $1.9444 | $3.34 |
| Motor Vehicles | 1.778 | 3.24 |
| Steel | 1.703 | 3.36 |

(* August only)

As significant as wage scales undoubtedly have been in inducing mechanization in the bituminous coal industry, at least equally conducive to such mechanization has been the competition that coal has undergone from other fuels, such as gas and oil, in the period since 1940. Since World War II a veritable revolution has occurred in the fuel and energy market. The effect of this revolution upon the coal industry, both nationally and within the State of Tennessee, is graphically portrayed in a series of nine charts which are made Appendix "A" to this opinion. Suffice it to say, by way of summary, that whereas coal provided 47.2% of the total fuel energy consumed in the United States in 1940, as compared with 43.8% provided by crude oil, petroleum and natural gas, by 1964 coal's share had been reduced to 21.8% while the shares of other fuels had increased to 73.8% (Chart No. 1). In the same period (1940–1964) the industrial market for coal dropped from 30.3% to 23.1%, retail sales dropped from 19.6% to 4.6% and railroads dropped from 19.8% to almost nothing in 1964. Another significant influence in the coal market was the shift in sales from the more profitable retail and railroad markets, as shown above, to the highly competitive electric utility market. Whereas in 1940 electric utilities used 11.4% of total coal production, by 1964 they were using 51.7% of total coal production (Chart No. 2). All this has affected coal, not only percentage wise and price wise, but during the 1950's almost 20% of the total bituminous coal market was lost to other fuels and energy sources. Whereas coal production in 1940 amounted to 461,000,000 tons, and increased to 516,000,000 tons in 1950, by 1958 it had declined to 410,000,000 tons. (Production had increased to 487,000,000 tons by 1964, a figure still below the 1950 production, however.)

It is apparent, at least in viewing the national picture, that coal was forced to mechanize to survive. The results have been dramatic. Employment in the industry has fallen from 416,000 men in 1950 to approximately 180,000 men in 1959 and to approximately 130,000 men in 1964. Average daily production by the American miners has increased from 4½ tons per day in 1940 to 12 tons per day in 1961 and to 16.84 tons per day in 1964. (In Tennessee production went up from 3.38 tons per day in 1950 to 10.15 tons per day in 1964.) These figures compare with British production of 1.23 tons per day, 0.83 tons per day in Belgium, France and Austria, and 0.62 tons per day in India. A Japanese miner must work 18 days to produce the daily production of an American miner.

Undoubtedly the combination of the economic forces discussed above have borne heavily upon the marginal coal producer who has been unable to remain competitive in the face of rising costs, declining prices and heavy capital expenditures required for mechanization, as these pressures have likewise borne heavily upon the miner who found himself unemployed as a result thereof. But the economic pressures created by technological advances and the competition engendered thereby do not equate to a Sherman Act violation. Upon the contrary, the Sherman Act is designed to keep the market open so that such competitive pressures may operate.

Perhaps more significant to the plaintiffs' contentions is the fact that during the decade between 1949 and 1959 the loss in the share of the market experienced by the large mines (No. 1 mines) in the period just prior to 1949 was reversed and their share of the market increased from 29.3% in 1949 to 49.9% in 1959. Likewise, the profitableness of coal mining appears definitely to have favored the larger producers by 1959. It appears that in 1959 Peabody Coal Company and Consolidation Coal Company together realized a net of $43,000,000.00, while the rest of the industry suffered a net loss of $12,500,000.00. No

clear antitrust significance can be drawn from these statistics. Their relationship to any Sherman Act conspiracy is certainly not patent, as is likewise true of the full U.M.W.-Coal Industry collective bargaining record between 1950 and 1958, all as hereinabove described. The Court being unable to infer any Sherman Act conspiracy from the record to this point, these matters must accordingly be considered subsequently in the light of the total record.

## THE PROTECTIVE WAGE CLAUSE

The plaintiffs contend that in the negotiations between the U.M.W. and the B.C.O.A. upon the 1958 amendment, the parties formalized the tacit agreement previously existing between themselves whereby the U.M.W. committed itself to impose and enforce the national contract without modification upon all coal operators with whom it subsequently negotiated.

It is alleged that this was agreed to in a provision of the contract commonly referred to as the "Protective Wage Clause". The Court must accordingly look to these matters.

The background to the inclusion of the Protective Wage Clause in the 1958 amendment appears to go back possibly as far as 1943. At that time the U.M.W. was complaining that signatory operators were subcontracting work to avoid the terms of the contract. During a period of government seizure that year, the National War Labor Board issued a directive that each agreement contain a provision that "operators agree that they will not lease any operating mines subject to this agreement as a subterfuge" to avoid the agreement's provisions. This anti-leasing clause was carried forward in each agreement through the 1951 amendment. The clause was somewhat expanded in the 1952 amendment and carried forward in this expanded form in the 1955 and 1956 amendments. The subject again came up for discussion in the 1958 negotiations and the U.M.W. sought to further expand the clause by including all forms of subcontracting having as its effect the evasion of the terms of the contract. In the ensuing negotiations the B.C.O.A. sought some reciprocal agreement in regard to enforcement of the contract by the Union.

The agreement reached on these matters has since been referred to as the "Protective Wage Clause". The Protective Wage Clause is rather lengthy in its full provisions. However, it is to Paragraph "A" of the clause that the antitrust violation here charged is particularly directed. Paragraph "B" of the Protective Wage Clause has to do with the obligation of the operators in regard to subcontracting and leasing. The subsequent paragraphs of the Protective Wage Clause have to do with the functioning of a joint industry contract committee in disposing of reported cases of violation of the Protective Wage Clause.[2]

Before discussing the provisions of Paragraph A, however, it should be noted that the plaintiffs contend that a further

---

2. The history of the Protective Wage Clause subsequent to 1958 was recounted in the record, but the Court does not deem this material to the present issue. That history reflects that the legality of the Protective Wage Clause under Section 8(e) of the Landrum-Griffin Act, the so-called hot cargo provision, was placed in issue before the National Labor Relations Board. A decision by that Board adverse to the legality of the clause was reversed upon appeal and the case was remanded for further findings. In the 1964 amendment to the National Bituminous Coal Wage Agreement, the Protective Wage Clause was eliminated, or so the Union contends. A provision was inserted, however, whereby operators agreed to payment of a welfare fund royalty of 80¢ per ton, in lieu of 40¢ per ton, upon all coal purchased by the signatory operators that was not produced in compliance with the national contract.

relevant background to the negotiations of the Protective Wage Clause was the fact that there had been a decline in coal production in 1958, production declining from 493,000,000 tons in 1957 to 410,-000,000 tons in 1958. There appears to have been some drop in prices, also. The plaintiffs suggest that these facts formed the motivation for tightening the conspiracy by including the Protective Wage Clause in the 1958 amendment. It is contended that the further wage scale increases negotiated in the 1958 amendment were also part of the conspiracy.

Paragraph A of the Protective Wage Clause provides as follows:

"During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or on any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

▆▆ The plaintiffs contend that the U.M.W. agreed with the B.C.O.A. by the foregoing language that it would not enter into a contract with any other party or bargaining unit upon any terms other than the National Bituminous Coal Wage Agreement. This, it is contended, amounts to a commitment by the Union with one set of employers to impose an agreed wage scale and a set of fixed labor standards upon all other employers with whom it negotiated. Not only does this forfeit its labor union exemption from the antitrust laws, in accordance with the ruling of the Supreme Court

in the United Mine Workers v. Pennington case, supra, but the plaintiffs contend that the Protective Wage Clause constitutes a per se Sherman Act violation under that case. In support of their contentions in this regard, the plaintiffs rely upon the following language from the opinion of Justice White in the *Pennington* case:

"We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units * * *

* * * * * *

"From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffers from a more basic defect, *without regard to predatory intention or effect in the particular case.* For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy * * It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy." (Emphasis added)

The defendant, upon the other hand, contends that the language of Paragraph A of the Protective Wage Clause commits the Union only to enforce the contract uniformly as between parties signatory to the contract, but leaves the Union free to bargain upon any terms it sees fit with non-signatory operators. It is the position of the U.M.W. that, just

as the operators who signed the agreement committed themselves under the provisions of Paragraph B not to evade or debase the labor standards set out in the agreement by subcontracting the purchase of coal produced at substandard levels or subleasing coal lands where the result would have different consequences, so the Union assured operators who were signatory to the agreement that it would not enter into or permit any agreement governing labor standards "applicable to employees covered by this contract" on any basis other than those specified by the contract. Under this construction of the clause there would be no forfeiture of the Union's exemption under the antitrust laws in accordance with the above language of the Supreme Court in the *Pennington* case.

The Court is thus confronted with a construction of the meaning of the language used in Paragraph A of the Protective Wage Clause. The language used is not without ambiguity. The plaintiffs in effect concede as much when they state, "While the sentence does not affirmatively state that the Union will take this contract and force it on all other bargaining units," the language can only mean just that.

 The law is well settled in this regard that where two constructions of a written contract are reasonably possible, preference must be given to that one which does not result in a violation of law. Great Northern Railway Co. v. Delmar Co., 283 U.S. 686, 51 S.Ct. 578, 75 L.Ed. 1349; Perry Coal Co. v. N. L. R. B., 7 Cir., 284 F.2d 910; Williston on Contracts, Sec. 236. Applying such a rule of construction to the language of Paragraph A of the Protective Wage Clause, it appears that should the language be given the construction contended for the plaintiffs, a violation of law would result, whereas should the construction contended for by the defendant be given, no violation would occur. The Court must accordingly adopt the latter construction and conclude that the Pro-

tective Wage Clause did not by its terms forfeit the Union's exemption from the antitrust laws. Upon this same issue the United States District Court, upon retrial of the *Pennington* case, reached the same conclusion with respect to the proper construction of the Protective Wage Clause. See Lewis v. Pennington, 257 F.Supp. 815 at 862 (D.C.E.D.Tenn., 1966).

 Having concluded that the Protective Wage Clause does not constitute an express commitment upon the part of the U.M.W. to the B.C.O.A. not to bargain with any other coal operator upon any terms other than the national contract, this does not conclude the issue of whether the U.M.W. did in fact, though not expressly, so contract with the B.C. O.A. Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree. However, the standard of proof where a labor union is involved is "clear proof", as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion. United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. The Court is of the opinion that the evidence upon the record in this case does not establish such clear and unequivocal proof as to warrant the Court in finding that the U.M.W. pursued its policy of uniformity of wage and labor standards by agreement with one or more employers, as distinguished from pursuing such policy upon its own. The only direct evidence in the record is to the effect that the Union pursued such policy upon its own, and not in agreement with any employer.

### THE U.M.W. INVESTMENTS IN WEST KENTUCKY COAL COMPANY

Apart from the collective bargaining activities of U.M.W. during the decade of

the 1950's, or, more correctly, in addition to such activities, the plaintiffs contend that they were each damaged as a result of a Sherman Act conspiracy between the U.M.W. and West Kentucky Coal Company, together with its subsidiary, Nashville Coal Company, to drive the plaintiffs from the T.V.A. coal market. This conspiracy is alleged to be part and parcel of the overall conspiracy. The plaintiffs' contentions with respect ot this phase of the case, if sustained by the record, are sufficient when standing alone, however, to establish a Sherman Act conspiracy directed at the plaintiffs. These matters must therefore be examined with a view both to their separate significance and to their significance when viewed in light of the record as a whole.

In regard to the investment of U.M.W. funds in West Kentucky Coal Company and its subsidiary, Nashville Coal Company, the undisputed record reveals a most unusual series of financial transactions involving union funds. The undisputed record reflects that commencing in 1951 and continuing until 1963, when the U.M.W. finally disposed of its interest in West Kentucky Coal Company, the U.M.W. made a series of loans or investments with regard to the capital stock of West Kentucky Coal Company and Nashville Coal Company, the latter company having become a wholly owned subsidiary of West Kentucky Coal Company in 1955. By 1958 the U.M.W. had loaned or invested $25,456,156.37 in West Kentucky Coal Company and its subsidiary, Nashville Coal Company.[3] A substantial part of these funds were loaned to Cyrus Eaton or to holding companies and investment companies affiliated with Mr. Eaton. Mr. Eaton is a business man having a wide variety of interests. The proceeds from these loans were to be used by Mr. Eaton and his associates to acquire stock in West Kentucky Coal Company, and later in Nashville Coal Company. These loans were made on demand notes, secured by the stock. The borrower could repay the notes at any time by surrender of the collateral and be relieved of any personal liability. Interest was payable on

---

3. By July 1, 1958, the U.M.W. had made the following investments in West Kentucky Coal Company and Nashville Coal Company:

In Nashville Coal Company:

| | |
|---|---|
| 25,000 shares (Chertsey loan collateral) | $2,652,000.00 |
| 10,000 shares (Sagamore loan collateral) | $1,050,000.00 |
| 10,000 shares (Tower loan collateral) | $1,050,000.00 |
| TOTAL | $4,725,000.00 |

In West Kentucky Coal Company:

| | |
|---|---|
| 85,400 common shares owned | $2,354,522.04 |
| 50,000 preferred shares owned | $2,500,000.00 |
| Pledge of assets on bank loan | $5,200,000.00 |
| 90,600 shares (Cyrus Eaton loan collateral) | $2,513,895.18 |
| 84,560 shares (Chertsey loan collateral) | $2,153,279.50 |
| 84,912 shares (Sagamore loan collateral) | $2,287,809.32 |
| 25,300 shares (Tower loan collateral) | 443,223.90 |
| 5,200 shares (Tower loan collateral) | 77,938.32 |
| 1,300 shares (Tower loan collateral) | 18,847.04 |
| 8,128 shares (Tower loan collateral) | 176,461.07 |
| 20,000 shares (Tower loan collateral) | 491,430.00 |
| 50,000 shares (Colton loan collateral) | $1,506,875.00 |
| 25,000 shares (Combs loan collateral) | $1,006,875.00 |
| Total | $20,731,156.37 |
| Total in both Companies | $25,456,156.37 |

the notes only out of dividends, with provision in some notes that interest would be payable only out of one-half of the dividends. Loans of U.M.W. funds were made upon the same basis and for the same purposes to Mr. Colton, President of the National Bank of Washington, a bank in which the U.M.W. was a majority stockholder.

By means of the above loans and investments U.M.W. acquired control of 480,400 shares of common stock in West Kentucky Coal Company out of a total of 857,264 outstanding common shares. It also acquired 50,000 shares of preferred stock having voting rights. Mr. Eaton and his associates assumed control of the Board of Directors of West Kentucky Coal Company during 1952 and 1953 with Mr. Eaton becoming Chairman of the Board in 1953. Immediately after Mr. Eaton assumed control, West Kentucky signed the National Bituminous Coal Wage Agreement, the first time in its history that it had signed a contract with the U.M.W.

Except for the above known facts and the uniform denial by both U.M.W. and West Kentucky officials of any control of management policies by U.M.W., the extent to which U.M.W. may have controlled the policies and activities of West Kentucky Coal Company and Nashville Coal Company as they relate to the T.V.A. coal market and to these plaintiffs can only be inferred. Furthermore, the reasons for which loans and investments were made in West Kentucky and its subsidiary, Nashville Coal Company, must likewise largely be inferred, as the reasons given by the U.M.W. for doing so will not bear scrutiny. As an investment of union funds, there was no real basis for the Union hoping for anything better than a recovery of its principal. The loans were made with no obligation to pay interest except out of profits, with profits to be shared with the borrower, with losses to be borne solely by the Union, with the borrower having no obligation to repay except by surrender of the collateral and with the borrower having the right to acquire the collateral at any time by payment of the loan. A more unsatisfactory form of investment from the viewpoint of the lender can scarcely be imagined. For a union to purchase a controlling interest in a corporation to obtain the execution of a union contract is certainly a novel approach to collective bargaining. If this were the reason, it is difficult to understand why large investments and loans continued to be made after the union contract was signed. It is suggested that the welfare fund benefited greatly from royalties paid by West Kentucky after it became a signatory to the national contract. It appears, however, that the U.M.W. lost in excess of $8,000,000.00 upon closing out its loans and investments in West Kentucky in 1963. To justify these losses of union funds by royalties received by the welfare fund is certainly a novel form of accounting.

Whether the inference sought to be drawn by the plaintiffs from the U.M.W. loans and investments in West Kentucky and in Nashville Coal Company, namely that they were a part of a conspiracy aimed at destruction of the Southeastern Tennessee coal field as a source of supply for the T.V.A. coal market, is a matter the consideration of which should logically be deferred for the present. Whether such a purpose could be inferred becomes relevant only after a determination is first made that West Kentucky Coal Company and Nashville Coal Company did in fact engage in the predatory pricing of coal upon the T.V.A. coal market for the purpose of driving the plaintiffs from that market. Unless the evidence supports the conclusion that West Kentucky and Nashville themselves engaged in such antitrust activities there would be no purpose served in seeking to determine if the U.M.W. conspired to direct or control their policies to such ends. The Court will accordingly now look to these matters.

## The T.V.A. Coal Market

An understanding of the T.V.A. coal market is essential to an understanding of coal pricing upon that market and accordingly essential to an understanding of the activities of West Kentucky Coal Company and others in bidding and selling upon that market. By 1951 the Tennessee Valley Authority had largely completed the development of hydro electric power production to the extent of its economic potential within its area. In order to supply the electric power demands made upon its system during the next decade, it turned to steam plant construction. Illustrative of this increased demand is the fact that consumption of T.V.A. electric power by the United States Atomic Energy Commission increased by a factor of 14 between 1951 and 1956, until it was consuming more than 50% of T.V.A.'s total power production. Having evaluated the fuel market, the T.V.A. turned to coal exclusively to fuel its steam plants. The enormous and rapid development of its steam plant system was recounted in detail upon the trial. Suffice it to say that whereas steam accounted for only one-sixth of the T.V.A. power production in 1951, by 1961 three times as much electricity was produced by steam as by hydro power. At the end of that decade the T.V.A. had 12 steam plants in operation or under construction. Power production from these plants increased from 2½ billion kilowatt hours in 1951 to 48 billion kilowatt hours in 1961 and the T.V.A. had become the world's largest coal purchaser, purchasing one-tenth of all of the coal sold upon the electric utility market in the United States. Annual coal consumption by the T.V.A. went from approximately 1,000,000 tons per year in 1951 to approximately 20,000,000 tons in 1961.

In planning the location of each steam plant the T.V.A. sought to locate each plant where it could draw upon two or more coal fields and be served by two or more modes of transportation. The Widow's Creek steam plant, located in Northern Alabama approximately 50 miles from the center of the Southeastern Tennessee coal field, is the plant principally involved in this lawsuit. It is served by the Southeastern Tennessee coal fields located in Marion, Grundy and Sequatchie Counties. Coal also moves to the Widow's Creek plant from the Western Kentucky mines, both by train and by barge or a combination thereof. A small amount of coal moves to Widow's Creek from the Northern Alabama mines.

Apart from emergencies, the T.V.A. is required by law to purchase its coal upon competitive bidding. These bids are evaluated upon the basis of destination b. t. u. cost. That is, in evaluating bids the T.V.A. takes into account (1) the cost of coal at its origin, (2) the cost of transportation, and (3) the quality or b. t. u. content of the coal. The cost is normally computed by T.V.A. in terms of cents per million b. t. u.'s delivered to the plant at which the coal is to be burned.

The T.V.A. employs two basic types of purchases in obtaining coal. The first is its term contract program and by this method T.V.A. obtains the bulk of its coal supply. The second type is its spot purchasing program under which coal is purchased on a week to week basis. No spot contract awarded has a delivery term of more than four weeks. Under each of these methods of procurement, the low responsive bidders are awarded contracts.

The T.V.A. buys most of its coal on the term market and has in fact adopted a policy that requires at least 75% of its coal to be obtained by this method. By 1962 88% of its coal requirements were in fact being obtained by term contracts, with only 12% being purchased on the spot market. In the early years T.V.A. granted a few coal purchase contracts up to ten years in duration. Due to unsatisfactory price escalation experience, it then concluded it could get a better price by limiting the term of the contract to not less than six months nor more than three years and the amount

of coal to not less than 500 tons nor more than 10,000 tons per week. This policy prevailed from about 1951 until 1957. At that time the T.V.A. began to look upon longer term contracts as its basic source of supply and began granting contracts with terms of four, five and ten years or longer.

In contrast to the term coal market in which bids are taken by T.V.A. at irregular intervals, usually two or three times a year, purchases of spot market coal are made by T.V.A. each month. The invitation reflects the amount of spot coal T.V.A. would like to buy during the succeeding month. The spot program is designed to gear receipts of coal more closely to actual needs. Coal burn is not uniform from day to day and it depends on the load at the individual plants, the available hydro power and many other factors. The spot program thus supplements the term program which is the primary source of supply and serves to keep the peaks and valleys of burn and receipt as low as possible.

Another factor to consider in seeking to understand the T.V.A. coal market is that the various steam plants and load centers of the T.V.A. system are connected by transmission lines and the system is thus an integrated system. This permits a determination to be made with regard to the most economic loading of the system. An electronic computer is used to make this determination which results in the "capacity factor" at which various plants are operated—the capacity factor being the ratio of the average load at a given plant to the plant's maximum capacity. Loads vary at different places and at different times of day as well as at different seasons, hence the necessity for such determination to be made. On the basis of all relevant cost factors and load factors,

the electronic computers determine the lowest total cost of generating power at any particular time and generation is shifted to those plants having the lowest cost. This materially affects the amount of coal used at any particular plant, as the cost of coal constitutes approximately 50% of the cost of producing and distributing electric power.

There are certain relevant conclusions that can be drawn from the foregoing with respect to the T.V.A. coal market. In the first place, it has provided a very large coal market in the Tennessee Valley area that was almost non-existent prior to 1950. This calls for steady supplies of very large quantities of coal. In the second place, all purchases of coal are made on the basis of public bidding open to all producers (excluding coal producers in violation of federal minimum wage and other relevant laws). The market is thus very competitive. In the third place, the market is highly cost conscious. B. t. u. cost at the steam plant where the coal is to be burned is the overriding factor in coal sales being made upon the T.V.A. market. Finally, since the T.V.A. system is integrated, and rather rapid shifts can be made from steam plants having higher costs of power generation to those having lower costs of power generation, a system-wide competitive effect is exerted on coal prices.[4] Finally, it is reasonable to conclude that T.V.A. coal buying policies and practices have at least in part been responsible for lower than average coal prices. The T.V.A. pays about 20¢ to 22¢ per ton less than other public utilities on the average.

*Coal Pricing on the T.V.A. Market by West Kentucky Coal Company*

A very detailed and voluminous record was established upon the trial of this

4. This latter competitive effect is particularly significant with respect to the Widow's Creek plant, where a substantial cut-back in coal purchasing occurred in 1956 and 1957 due to the fact that its coal costs had become the highest in the T.V.A. system. The Widow's Creek plant provided the nearest T.V.A. market for the Southeastern Tennessee coal field. Further expansion of the Widow's Creek plant occurred in 1960, but only after a reduced rail rate in 1960 had lowered coal transportation costs from the Western Kentucky field.

case with respect to bidding upon the T.V.A. coal market over the period from 1953 to the date of the trial. Without attempting an exhaustive statement of this record, the Court will attempt to draw from it the facts that would appear to be of controlling significance.

The plaintiffs' view of this evidence is that the award of T.V.A. contracts to a number of Southeastern Tennessee coal producers at the April 15, 1954, bid opening called the attention of the U.M.W. to this market in particular, with the result that the U.M.W. accused the T.V.A. of "still pursuing its short-sighted and dog-eat-dog policy of buying coal". This not only brought U.M.W. fomented labor troubles to the Southeastern Tennessee coal field (to which the Court will give its attention in a subsequent portion of this opinion) but also brought the large coal companies, including West Kentucky Coal Company, who, acting in conspiracy with the U.M.W., set out to drive the plaintiffs from the T.V.A. coal market by predatory pricing of coal upon that market. By dumping large quantities of coal upon the T.V.A. spot market, bidding at extremely low prices, in some instances below cost, West Kentucky and its subsidiary, Nashville Coal Company, as well as other large coal producers alleged to be in on the conspiracy, drove the T.V.A. spot market average price on coal at Widow's Creek plant from 21.37¢ per million b. t. u. in 1956 to 16.50¢ per million b. t. u. by 1958. The plaintiffs were thereby largely driven from the T.V.A. spot market. Similar predatory pricing by West Kentucky and other co-conspirators succeeded in capturing the bulk of the T.V.A. term market so that by 1964 West Kentucky and Peabody Coal Company together were shipping 10,215,000 tons per year on these contracts, which amounted to approximately 50% of the total annual purchases of coal by the T.V.A. The plaintiffs were thereby largely, if not wholly, driven from the T.V.A. term market. Thus, by a conspiracy directed both at raising the plaintiffs' labor costs to excessively high levels, while at the same time driving the price of coal upon the T.V.A. market to a level near or below cost, the U.M.W. and its co-conspirators have succeeded in driving the Southeastern Tennessee coal field from the T.V.A. coal market. Having accomplished their purpose, the U.M.W. sold out its interest in West Kentucky Coal Company in 1963, taking an $8,000,000 loss thereon.

As noted above, the plaintiffs do not confine their charges of conspiracy upon the T.V.A. coal market to the activities of West Kentucky Coal Company and its subsidiary, Nashville Coal Company. Rather, other coal companies are also alleged to have participated in one degree or another in the assault upon the T.V.A. market. These include Consolidation Coal Company, The Pocahontas Coal Company, Island Creek Coal Company, The Pittston Company (Clinchfield Coal Company), Pittsburg-Midway Coal Company, and the Peabody Coal Company. Other than Peabody Coal Company, however, these coal producers are not believed by the Court to have had sufficient impact upon the T.V.A. coal market to deserve further attention. Their impact may be briefly summarized as follows:

*Consolidation Coal Company.*—During most of the period material to this case, Consolidation Coal Company was the largest coal company in the United States. However, it was never very important in the T.V.A. market. Although T.V.A. officials sought to interest Consolidation Coal Company in the market, the company failed to respond. Consolidation Coal Company acquired Pocahontas Coal Company during this period. Prior to that, Pocahontas had acquired the Moore mining properties in Anderson County, Tennessee. Coal from these mines has been sold to the T.V.A., though not on an extensive basis. Consolidation and Pocahontas together supplied T.V.A. less than 1% of T.V.A.'s coal during the period 1952 to 1962.

*Island Creek Coal Company.*—This company played no part in the T.V.A.

market until it acquired West Kentucky Coal Company in 1963, this acquisition being made at the time the U.M.W. sold its interest in West Kentucky Coal Company to Island Creek Coal Company.

*The Pittston Company (Clinchfield Coal Company).*—This company has been of moderate importance to T.V.A.'s program. It operated a mine near Monterey, Tennessee, during much of the period and developed a mine in West Virginia (Moss No. 3 Mine), which supplied substantial quantities of coal to the John Sevier steam plant located in upper East Tennessee. It appears that Clinchfield developed its moss mine largely to supply a power plant built by the Appalachian Power Company in Virginia and accordingly T.V.A. has not obtained long term contracts for coal from Clinchfield. Clinchfield supplied approximately 5% of T.V.A.'s coal requirement during the period 1952–1962.

*Pittsburg-Midway Coal Company.*— This company supplied approximately 2% of T.V.A.'s coal requirements during the period 1952–1962. In this regard it compares with Tennessee Products & Chemical Corporation and Tennessee Consolidated Coal Company.

*Peabody Coal Company.*—Upon the other hand, Peabody Coal Company has been a quite significant participant upon the T.V.A. coal market, particularly in recent years. It was not a significant supplier of coal to T.V.A. during the early 1950's. Following its merger with Sinclair Coal Company it became an important supplier of T.V.A. coal. As a result of a bid in 1959, a T.V.A. contract was eventually awarded to Peabody for the purchase of 65,000,000 tons of coal to be delivered over a period of years to a new steam plant, the Paradise plant, which steam plant was to be built adjacent to the Peabody property from which the coal was to be mined. By 1964 Peabody was shipping to T.V.A. coal on this contract and other contracts at the rate of 5,975,000 tons per year, more than

25% of the total T.V.A. coal purchases for that year. However, 4,000,000 tons per year of this total was shipped by Peabody under its T.V.A. contract for the Paradise steam plant.

Peabody produces most of its coal by strip mining in the states of Oklahoma, Missouri, Illinois, Indiana, Ohio and Western Kentucky. It serves most of the important electric utilities in the middle western area and operates approximately 30 mines.

The plaintiffs contend that there were close operating and selling relationships between Peabody Coal Company and West Kentucky Coal Company. There is evidence that these two companies have done a substantial amount of business with each other, including the sharing of coal sales contracts, such as on the Tampa Electric Company contract which Peabody bid after West Kentucky had refused performance on an earlier contract which it had bid with the same electric company. However, the evidence does not sustain the conclusion that the relationship between Peabody and West Kentucky was anything other than a competitive relationship, nor that their dealings with each other were anything other than mutually advantageous business dealings. In the opinion of the Court, the evidence does not support a finding that Peabody was itself a party to any conspiracy either with West Kentucky Coal Company or with the U.M.W. Peabody was in fact not even a member of the B.C.O.A., with whom the U.M.W. is alleged to have conspired.

The present issue, in the opinion of the Court, therefore confines itself to the activities of West Kentucky Coal Company and its subsidiary, Nashville Coal Company, and their coal pricing upon the T.V.A. market.

That West Kentucky (and Nashville) have played a significant role on the T.V.A. coal market in recent years cannot be doubted. Just how substantial a role is demonstrated by the following

table showing annual shipments made by them to the T.V.A. and showing the percentage of T.V.A. coal supplied by them for each of the years 1954 through 1964:

| Year | T.V.A. Total Receipts | Tonnage Shipped by West Kentucky & Nashville Coal Inc. | Per Cent of Company Shipments to Total |
|------|------|------|------|
| 1954 | 10,196,290 | 978,824 | 9.6 |
| 1955 | 14,377,000 | 1,298,923 | 9.0 |
| 1956 | 20,354,000 | 1,511,987 | 7.4 |
| 1957 | 19,581,879 | 963,384 | 4.9 |
| 1958 | 17,033,466 | 1,094,396 | 6.4 |
| 1959 | 17,808,900 | 1,336,870 | 7.5 |
| 1960 | 18,886,000 | 1,575,000 | 8.3 |
| 1961 | 18,674,000 | 1,681,000 | 9.0 |
| 1962 | 19,172,000 | 2,000,000 | 10.4 |
| 1963 | 22,141,000 | 3,394,000 | 15.3 |
| 1964 | 22,847,000 | 3,700,000 | 16.2 |

It should be noted, however, that prior to May 28, 1964, none of the above coal was shipped to the Widow's Creek plant, the point of most direct competition between the plaintiffs and West Kentucky.

Turning first to the activity of West Kentucky (and Nashville) upon the T.V.A. spot market, it is the contention of the plaintiffs that these companies dumped extraordinarily large quantities of coal upon the spot market at steadily declining prices, particularly during the period from 1956 through 1958, forcing the price from 21.37¢ per million b. t. u. in 1956 down to 16.50¢ per million b. t. u. in 1958. (In translating a b. t. u. price to a tonnage price, the quality of coal is a significant factor. However, on the average one cent per million b. t. u. is equal to approximately 25¢ per ton on a tonnage price basis.) The evidence does not sustain the plaintiffs' charge. Although West Kentucky bid in 1956, its bid in each instance was well above the market and it did not receive a single award. An analysis of the bids in 1957 and 1958 reveals that West Kentucky bid 22 times on the spot market, but received only five awards, these successful bids all being from Nashville Coal Company's Uniontown mine to the T.V.A. Shawnee steam plant (Exhibit D–391). In not a single instance was West Kentucky the low bidder. In the first eight bids it was unsuccessful. On the ninth bid it got an award, but was the highest successful bidder. Its 10th, 11th and 12th bids were unsuccessful. Its 13th bid was successful, but again it was the highest successful bidder. Its 14th and 15th bids were unsuccessful. Its 16th and 17th bids were bid at the same price as the 14th and 15th bids, and were successful this time. In the 16th bid it was the highest successful bidder and in the 17th there were several lower bids. The 18th and 19th bids, at the same price as the four previous bids, were unsuccessful. The 20th bid was successful but was the second highest offer and there were no unsuccessful bidders on this solicitation. The 21st bid, at the same price, was unsuccessful. The 22nd bid was successful, but only by .02 mills per million b. t. u.

These figures show that on a declining spot market West Kentucky followed, but did not lead, the market and that on the few occasions that it was successful it was the highest, or nearly so, of the successful bidders.

Turning next to the activity of West Kentucky (and Nashville) upon the T.V.A. term market, it would appear that

in each bid submitted West Kentucky's bid was well within normal limits of existing competition. The following table is reconstructed from the record, and reflects the bidding of West Kentucky on the T.V.A. term coal market in the period from 1954 through 1959 (Exhibit P–173):

| Date of Bid | T.V.A. Requisition No. | Price Per Ton | Evaluated Relation to Other Bids |
|---|---|---|---|
| 9/15/54 | 21–825509 | $2.90 | 13th from lowest |
| 9/15/54 | 21–825509 | $2.67 | 17th from lowest |
| 5/19/55 | 16–831970P | $2.32 | Others lower |
| 9/23/55 | 364 | $2.35 | 13th from lowest |
| 9/23/55 | 364 | $2.68 | 13th from lowest |
| 9/23/55 | 364 | $2.31 | Others lower |
| 9/23/55 | 364 | $2.72 | 22nd from lowest |
| 9/23/55 | 364 | $2.49 | 22nd from lowest |
| 7/12/56 | 11180 | $2.80 | 6th from lowest |
| 7/12/56 | 11180 | $2.71 | 16th from lowest |
| 11/16/56 | 16240 | $3.21 | Low bid |
| 10/24/57 | 23923 | $2.58 | 3rd from lowest |
| 10/24/57 | 23923 | $2.54 | 4th from lowest |
| 10/24/57 | 23923 | $2.75 | 3rd from lowest |
| 10/24/57 | 23923 | $2.84 | Tie for low |
| 5/20/58 | 99095 | $3.95 | 5th from lowest |
| 5/ 5/59 | 25 | $2.66 | 2nd from lowest |

The Court recognizes that the foregoing table does not give all relevant data necessary to make an exact evaluation of the West Kentucky bids in comparison with the market. For example, the price per ton is not very meaningful as it is not compared with other tonnage prices. Such a comparison would have little meaning, however, as the grade of coal or the b. t. u. content varies. Also, while tonnage prices in most instances are f. o. b. mine, in other instances the tonnage price includes transportation. The evaluations likewise do not reflect the full particulars in every instance, as the evaluations vary depending upon the steam plant on which the evaluation is made. Likewise, the quantities of coal involved are not reflected. Upon the other hand, it should be recognized that the table includes only actual awards made to West Kentucky and does not include its unsuccessful bids. In reflecting that West Kentucky was underbid by other coal producers in every instance but two, the Court is of the opinion that the table gives a reasonably reliable picture of the nature of the competition faced by West Kentucky in bidding upon the T.V.A. term coal market for the period set forth.

Beginning in July of 1959 West Kentucky obtained the first of a series of four contracts for supplying large tonnages of coal to the T.V.A. upon long term contracts. All of these contracts were bid at $2.90 per ton f. o. b. mine. (One contract was let at $2.89 per ton after negotiations which gave West Kentucky additional latitude on coal size.) These contracts were designated as T–3, T–24, T–18 and T–6. The T–3 contract was obtained under Requisition 27 on bids opened in July of 1959 and was for delivery of 16,347 tons per week for 15 years to the Shawnee plant. The first award under the T–24 contract was obtained under Requisition 37 on bids opened in February of 1961 for delivery of 1,000,000 tons per year for ten years to the Gallatin steam plant. An award of a second million tons per year on this

contract was made in January of 1963 for the remaining term of the contract. The T–18 contract was made in April of 1963, and was for delivery of 9,700 tons per week for ten years to the Shawnee steam plant. The T–6 contract was made in October of 1963 and was for delivery of 9,823 tons per week for ten years to the Gallatin steam plant.

It is to these bids at $2.90 per ton that the plaintiffs direct their principal charge that West Kentucky sold coal at or below cost upon the T.V.A. market in order to drive the plaintiffs from that market. In support of this contention the plaintiffs rely upon evidence that reflects that whereas West Kentucky was operating at a substantial profit in 1951 and 1952, by 1958 and 1959 it was operating at a substantial loss and its stock declined in value from $25.00 to $11.00 per share. Additionally, some coal was supplied on these contracts from the Cherry Hill mine, which mine belonged to the Louisville Gas & Electric Company and was operated by the West Kentucky Coal Company under a contract whereby it had to pay the Louisville Gas & Electric Company $3.55 per ton for the coal.

The evidence does not appear to sustain the plaintiffs' contentions that the coal upon these contracts was offered and sold below cost. Rather, it appears that the $2.90 price was a matter of legitimate business judgment, with a view to making a profit on the coal while at the same time meeting competition in the market.

At the time West Kentucky first offered this coal to T.V.A. in 1959, it was in the process of working out a vein of coal in the Pleasant View mine designated as No. 11 coal. By driving down 90 feet it could reach a seam of coal designated as No. 9 coal and continue operating out of the same mine. To be able to sell the No. 9 coal in this way meant that the company could continue to utilize all of its capital investment and plant at the mine. If the company was unable to sell the coal, these items would largely be abandoned. The No. 9 coal unprepared did not have a market other than the utility market and even with preparation it did not enjoy a volume market. It appears that West Kentucky arrived at the price of $2.90 after discussion among the operating, sales, accounting and management people and these discussions reflected the opinion that the coal could be profitably marketed at $2.90 per ton.

It appears that upon a first mining of the No. 9 seam in 1959, under the T–3 contract, costs were $2.729 per ton before fixed administration costs of 20¢ per ton. There was evidence that these administration costs would largely have been incurred regardless of the contract. In 1960 total costs, including administration costs, were $2.925 per ton. While the $2.90 price was thus below cost in 1959 and 1960, there are two other factors to consider for these years. In the first place, the grade of coal turned out to be such that West Kentucky in fact realized $3.04 per ton under the contract. In the second place, this coal was mined during a period of development of the No. 9 seam, with resulting high costs. By 1961 total costs, including administration, were $2.697. In 1962 total costs were $2.72. In 1963 costs went up to $3.21 per ton, but this appears to have been due to a bad mine fire at the Pleasant View mine. This mine was later closed because of high costs, but the East Diamond mine was opened in 1963 and its total costs were $2.33 for that year and $2.723 for 1964. These cost figures would indicate that the $2.90 price was a matter of business judgment, and not predatory pricing to depress the T.V.A. coal market. This conclusion is further substantiated by evidence that the coal was offered by West Kentucky to other utilities at the same price. It is also substantiated by evidence of the price competition West Kentucky was faced with on the T.V.A. market.

The following table is reconstructed from the record and reflects the bidding of West Kentucky on the T.V.A. term coal market in the period from 1959 through 1963:

| Date of Bid | T.V.A. Requisition # | Price Per Ton (f. o. b. mine) | Evaluated Relation to Other Bids | Award Made |
|---|---|---|---|---|
| 7/27/59 | 27 | $2.90 | 4th from lowest | T–3 |
| 2/ 9/60 | 32 | $2.90 | 19th from lowest | None |
| 9/ 1/60 | 35 | $3.00 | 5th from lowest | None |
| 2/14/61 | 37 | $2.90 | 3rd from lowest | T–24 |
| 9/18/62 | 41 | $2.90 | 7th from lowest | T–18 |
| 1/15/63 | 42 | $2.90 | 3rd from lowest | None |
| 6/19/63 | 43 | $2.90 | 2nd from lowest | None |
| 10/15/63 | 44 | $2.90 | Low bid | T–6 |

While the above table does not reflect the fact that the bid evaluations, due to transportation costs, varied from one steam plant to another, the evaluations used were either those upon which an award was made, or in event West Kentucky was unsuccessful in its bid, upon the evaluation most favorable to the plaintiffs. In only one instance was West Kentucky the low bidder and this was at the Gallatin plant where it enjoyed a transportation advantage. At the Widow's Creek plant West Kentucky was never closer than third from the lowest bidder, and this was only after the Section 22 freight rate reduction had been placed into effect.

■ In this regard the plaintiffs sought to substantiate their conspiracy claim by reference to a freight rate reduction granted by the Interstate Commerce Commission in 1960 under Section 22 of the relevant statute. In that year The Louisville and Nashville Railroad Company and the Tennessee Valley Authority joined in requesting a rate reduction of railway freight rates for hauling coal from the western area of Kentucky to the Widow's Creek steam plant, the request being to reduce this rate from $2.40 per ton to $1.60 or $1.40 per ton, depending upon the volume hauled. This reduction was opposed by coal operators in the Southeastern Tennessee coal field. The reduction was granted by the Interstate Commerce Commission.[5] There is no evidence that this had any relation to any conspiracy involving either the U.M.W. or West Kentucky Coal Company. In any event, since it involves an appeal to a governmental agency, it could not involve a Sherman Act violation. United Mine Workers v. Pennington, 381 U.S. 657, 86 S.Ct. 1585, 14 L.Ed.2d 626.

■ The Court concludes that the evidence fails to establish that West Kentucky Coal Company or its subsidiary, Nashville Coal Company, engaged in predatory pricing of coal upon the T.V.A. market. It rather appears that West Kentucky and Nashville based their prices upon legitimate business considerations and were attempting at all times to meet competition, rather than lead the market downward. Having so concluded, it becomes unnecessary to consider further the responsibility of the U.M.W., if any, for West Kentucky and Nashville's coal pricing policies.

That the competition faced by coal producers in the Southeastern Tennessee coal field on the T.V.A. coal market after 1956 from West Kentucky Coal Company and others bidding on that market was sufficient to largely drive them from the market by 1962 cannot be

5. The T.V.A. predicated their 1960 expansion of the Widow's Creek steam plant upon the granting of this cut in freight rates.

doubted. However, with respect to the Widow's Creek steam plant, the principal T.V.A. market for the Southeastern Tennessee coal field, it is only fair to note that the operators in that field have some competitive advantages. The Widow's Creek steam plant is located in Northern Alabama within 50 miles of the Southeastern Tennessee coal field. The principal competitors for that market are located in Illinois, Indiana and Western Kentucky. The Southeastern Tennessee producers not only have a transportation advantage, but they generally produce a higher grade coal. The superior quality of the Tennessee coal gives it a price advantage of approximately 50¢ per ton on the average over that from Illinois, Indiana and Western Kentucky. In addition, it had a transportation advantage over West Kentucky of approximately $1.40 per ton prior to 1960. With the Section 22 rail rate reduction in 1960, this advantage was reduced to approximately 80¢ per ton. Accordingly, because of the quality and transportation advantages, a mine price of $2.90 per ton in Western Kentucky was equivalent to a mine price of approximately $4.50 per ton in the Southeastern Tennessee coal field on the T.V.A. coal market at Widow's Creek.

### THE U.M.W. AND EVENTS IN SOUTHEASTERN TENNESSEE COAL FIELD

The plaintiffs' contention that they were the victims of a conspiracy upon the part of U.M.W. and others to drive them from the coal market by the predatory pricing of coal upon their market is, of course, but one phase of their allegations against the defendant. In addition to this, as well as in addition to their other contentions with respect to the U.M.W. being a party to a conspiracy directed toward all small or marginal coal producers, of which they are but a part, the plaintiffs also contend that they were the victims of a Sherman Act conspiracy upon the part of the U.M.W. directed specifically at the Southeastern Tennessee coal field. In this

phase of the case the plaintiffs rely upon the alleged refusal of U.M.W. to bargain with them, the refusal of U.M.W. to consider the limiting characteristics of the Southeastern Tennessee coal field, the attempt by the U.M.W. to force the national contract upon the field and the obstructionist tactics engaged in and violence fomented by the U.M.W. to prevent the production of coal in this field. The Court will now turn its attention to these contentions.

### Characteristics of the Southeastern Tennessee Coal Field

An understanding of some of the characteristics of the Southeastern Tennessee coal field and of the mining practices followed in this field is essential to an understanding of the respective contentions of the parties as they relate to the present phase of the case. With respect to the mining practices followed in the field, the Court has partially dealt with these matters in its identification of the various plaintiffs and description of the manner in which the fields were organized for mining. Further attention must now be given to each of these matters.

There are three coal mining areas in Tennessee. One is the upper East Tennessee field. It lies in the counties of Anderson, Campbell, Scott and Morgan. The Monterey field is located in the middle portion of the State, near Monterey, Tennessee. The Southeastern Tennessee field, with which this lawsuit is concerned, is principally located in the counties of Marion, Grundy and Sequatchie.

The production of coal in Tennessee has varied greatly through the years. In this regard it has roughly followed the pattern throughout the nation in the past 25 years, at least until the last five years. These ups and downs of production, both for Tennessee and for the United States as a whole, are set forth in Chart No. 3 to Appendix "A" to this opinion. The pattern of Tennessee coal production has been that production rose to approximately 6,000,000 tons per year during World War II, declined to 4,000,000 tons by 1949, increased to approximately 9,000,-

000 tons by 1956 and declined to approximately 6,000,000 tons by 1959, that level of production being maintained through 1964.

The seam of coal in the Southeastern Tennessee coal field, called the Sewanee seam, is located in a mountainous area of the State at an elevation of approximately 1800 feet. It is a rather high grade metallurgical coal. That is, it is usable for making coke for metalurgical purposes. However, the field has certain geological disadvantages. The principal of these is the thinness of the seam. The average thickness of the Sewanee seam appears to vary from 36 to 42 inches, but the seam is highly irregular in this respect. The seam is subject to squeezes and rolls in a very irregular and unpredictable manner; that is, the thickness of the seam varies and these conditions have no pattern. The seam may in one place be squeezed to a matter of a few inches in thickness or may be entirely pinched out by rock. In other places the coal may be rolled into a thickness up to six feet. Hazardous roof conditions are often encountered, especially in the areas of the rolls. The topography of the area is largely mountainous. Accordingly, most mining must be done underground, and the field does not lend itself to strip mining due to excessive overburden except in limited areas.

These geological conditions place the Southeastern Tennessee coal field at a disadvantage with many other coal fields. For example, whereas only 32% of the coal produced in Tennessee is produced from seams over four feet thick, 65% of the coal comes from seams over four feet thick in the United States as a whole. The irregular nature of the seam, its thinness and difficult roof conditions all pose problems for mechanization.

Geological conditions are among the matters claimed by the plaintiffs as rendering application of the National Bituminous Coal Wage Agreement to this field economically impossible, and therefore demonstrating the conspiratorial purpose of the U.M.W. in disregarding these conditions and seeking to force the national contract upon the field. This can more appropriately be evaluated after development of the history of the field in its relations with the U.M.W. Suffice it to say at this time that geological conditions have of course been a factor in competition with other coal producing areas and had their effect upon mining practices followed in the Southeastern Tennessee field. However, other conditions largely unrelated to geological conditions have likewise played a part. These include management policies, a general undercapitalization throughout the field, the pyramiding of leases, the nature of the T.V.A. coal market, labor practices and attitudes upon the part of workers and collective bargaining as practiced in the field.

### Collective Bargaining in the Southeastern Tennessee Coal Field

Turning to the history of collective bargaining between the U.M.W. and the operators in the Southeastern Tennessee coal field, it should be noted that the U.M.W. has at all times represented the clear, if not overwhelming, majority of the miners in the field. Accordingly, the majority of the plaintiffs were signatories to the National Bituminous Coal Wage Agreement throughout much of the period following 1950. Tennessee Products and Tennessee Consolidated performed in accordance with the contract, at least until such time as it was cancelled in accordance with its terms. However, the practice of non-compliance with the contract terms was widespread among the truck mine operators. There was substantial evidence in the record that the U.M.W., through its field representatives, knew of the failure of the truck mine operators to pay the union scale and to pay the full welfare fund royalty, but that they instructed the operators just to "do the best they could" to satisfy the miners and keep the mines working.

In the summer of 1955 a work stoppage involving several of the plaintiffs occurred over failure of the truck mine operators to make the two-week vacation payment called for in the contract. In the

course of this dispute U.M.W. raised the issue of the failure of the truck mine operators to pay the welfare fund royalty upon their full production. U.M.W. contends that it first learned of the failure to pay the full royalties due under the contract at this time and promptly sought enforcement. The plaintiffs contend that the U.M.W. attempted to enforce the contract commencing in 1955 after years of non-enforcement and that this change in policy was occasioned by U.M.W.'s conspiracy with the major coal companies. However this may be, an agreement was reached between the U.M.W. and the plaintiffs whereby the vacation pay issue was settled and the truck mine operators authorized Tennessee Products and Tennessee Consolidated, on future business, to deduct and remit to the Welfare Fund on coal sold through these companies on their T.V.A. contract. The miners went back to work after being off some two months or more.

This agreement as regards welfare fund payments was largely circumvented by the operators, however, by having the truck mine operators form their own association to bid on T.V.A. contracts rather than selling coal on the T.V.A. contracts of Tennessee Products and Tennessee Consolidated. The truck mine operators upon Tennessee Products leases formed themselves into the Mount Olive and the Holly Branch groups and the operators on the Tennessee Consolidated leases formed themselves into the Floyd Hollow Coal Company and Bee Branch Coal Company, and each secured T.V.A. contracts.

This time the failure of the operators to pay the welfare fund royalties resulted in a number of lawsuits being brought against them by the Welfare Fund in 1958 and 1959. Each of the plaintiffs other than Tennessee Products was sued. These suits to collect welfare fund royalties were eventually settled or dismissed, but were in some degree a motivating factor in the initiation of the present antitrust actions.

Throughout the period from 1958 on there have been sporadic turmoil and work stoppages in the Southeastern Tennessee coal field. These would sometimes affect but one mine or a group of mines. On occasion they would close most of the field. These disputes often arose over the miners' seeking to collect wage increases or vacation benefits provided for under the amendments to the national contract. For example, the 1956 amendment to the national contract provided for a $40.00 Christmas bonus. A strike involving a large number of truck mines occurred in December of 1956 and January of 1957 over non-payment of the bonus. More serious trouble was pending in connection with the working out of the large mines and the attempts at mechanization.

### Mechanization in the Southeastern Tennessee Coal Field

The history of mechanization at the Tennessee Products mines appears to be as follows. The old Whitwell Mine, a deep mine operated by Tennessee Products, worked out and was closed in June of 1946. It was a hand loading mine, employing 500 men and mining from 2200 to 2300 tons of coal per day. In the meantime, Tennessee Products had opened up the new Reels Cove Mine in 1943. Although it started out as a hand mine, it had largely been mechanized by 1948. It eventually achieved a production of 2500 to 2750 tons per day utilizing 250 men, or an average productivity of nine tons per man-day. By 1957 it became apparent that the Reels Cove Mine would soon work out. Operations and maintenance were gradually cut back until the Reels Cove Mine closed in 1962. In the meantime, a new major mine was projected by Tennessee Products at Morgansville, but failure of the parent company, Merritt-Chapman & Scott, to provide financing prevented this from materializing. Labor turmoil occasioned by miners released or about to be released from the Reels Cove Mine in seeking to assert seniority rights to jobs in the mechanized truck mines on Tennessee Products land at Griffith Creek, as more fully set forth hereinafter, was a substantial fac-

tor in the decision not to proceed with the Morgansville mine.

Commencing in 1957, Tennessee Products concluded to change its truck mines from hand mines to mechanized mines. This decision was prompted by the concern of the T.V.A. for increasing productivity in the Southeastern Tennessee coal field so that it might be a more competitive source of supply. A 10-year T.V.A. contract was accordingly awarded Tennessee Products predicated on increasing productivity to 17½ tons per man-day within two years. (It appears that productivity at the time was approximately 8½ tons per man-day.) Failure to achieve such productivity would give the T.V.A. the right to cancel the contract. Accordingly, mechanized mines were opened in the Griffith Creek area in 1958. Picketing by Reels Cove miners seeking to assert seniority rights to the Griffith Creek jobs caused work stoppages. The U.M.W. supported the miners in these disputes. An agreement was eventually worked out. The required productivity increase was not reached, however, with the result that the T.V.A. contract was eventually cancelled. The failure to achieve adequate productivity was due in part to conditions created by the Union-backed seniority demands. The failure to successfully mechanize the Griffith Creek Mine was principally due, however, to erratic coal seam conditions and bad roof conditions in the mines.

The history of mechanization at the Tennessee Consolidated mines followed a somewhat similar pattern. Until abandoned in 1949, Tennessee Consolidated operated the Palmer Mines, employing about 525 miners and producing about 2500 tons of coal per day. The Palmer Mine was replaced in 1949 by the Coal Valley A Mine, which ran until 1954. While the Coal Valley A Mine was still working, a companion mine called Coal Valley C Mine was developed. Mining methods at each of the three mines were progressively modernized in an effort to achieve greater productivity. At the Coal Valley A Mine productivity increased from seven to nine tons per man and by late 1956 Coal Valley C Mine had attained a productivity of 12½ tons per man. It appears that through 1960 Tennessee Consolidated's mechanized operations kept pace with the national productivity average for deep mines.[6] In 1957 the T.V.A. awarded a productivity incentive contract unto Tennessee Consolidated similar to the one awarded Tennessee Products. The purpose was the same, namely to encourage Tennessee Consolidated to increase productivity to 17½ tons per man-day so as to provide the T.V.A. with a more competitive coal supply from the Southeastern Tennessee coal field. Soon after the contract got under way, absenteeism reached an incidence of 18% of the work force and seriously curtailed productivity. The Company complained to District 19, U.M.W., and the Union undertook corrective action with some success. In 1959 there were several work stoppages caused by such matters as picketing to force a non-union bulldozer operator off the job and in protest to the wage scale set for shovel and auger operators in a strip and auger operation opened by the Company.

The failure to achieve the productivity goals set in the contract resulted in the T.V.A. cancelling the contract as of December 31, 1959. Tennessee Consolidated attributes its productivity failure to absenteeism, work stoppages and coal seam conditions. No doubt each of these matters did affect productivity. With regard to the work stoppages, however, the productivity test period had expired prior to the major portion of the work stoppages. The T.V.A. appears to have attributed a major portion of the blame for failure to achieve the productivity goal to management.

On January 12, 1960, after termination of the T.V.A. contract, Tennessee Consolidated gave notice of cancellation of the National Bituminous Coal Wage

6. National productivity increased from 6.43 tons per man-day in 1949 to 12.83 tons per man-day in 1960.

Agreement and all operations of the Coal Valley C Mine ceased on March 15, 1960. In the negotiations with the Union that followed, Tennessee Consolidated sought a wage scale tied to productivity. The U.M.W. refused. At this point Tennessee Consolidated organized a wholly owned subsidiary, Grundy Mining Company, and attempted to open the mines in the Gray's Creek area without a U.M.W. contract. These efforts were met with mass picketing accompanied by considerable violence, to which reference will be hereinafter made.[7] The result was that Grundy Mining Company was unable to get into operation during that year.

In April of 1961 Tennessee Consolidated entered into a contract with Allen & Garcia, an engineering firm with wide experience in the coal mining industry, to manage its mining operations. Allen & Garcia signed the National Bituminous Coal Wage Agreement and operation of the Coal Valley C Mine was resumed on July 10, 1961, but only after certain agreements were worked out with the Union relating to construction rates to be paid during an initial 10-week mine opening period and relating to seniority rights of former employees in the mine. The problem relating to seniority caused constant turmoil, the net result of which was that Allen & Garcia in many instances was not permitted to man its equipment with miners competent to operate the equipment. The major blame for this lies with the local union, but the U.M.W. must bear a share of the blame. On June 6, 1962, Allen & Garcia closed the Coal Valley C Mine. The immediate cause for closing the mine was that a rock fall made the mine inoperable.

In July of 1962 Allen & Garcia started a new mine for Tennessee Consolidated, known as Gray's Creek No. 11 Mine. They continued to be plagued with the seniority problem in trying to staff the mine with men competent to operate the equipment, with the result that they gave notice of cancellation of the national contract on August 21, 1962, and one month later terminated their management agreement with Tennessee Consolidated. The record of the local union and of the U.M.W. in their dealings with Allen & Garcia was a short sighted and sorry one. However, there is no direct evidence that it was a part of any Sherman Act conspiracy upon the part of the U.M.W. Whether such an inference can properly be drawn should await a completion of the review of the evidence on this phase of the case.

Upon withdrawal of Allen & Garcia from the field, Tennessee Consolidated attempted to continue operation of its Gray's Creek mine through its subsidiary, Grundy Mining Company. In the meantime, starting in August of 1962, District 19 of the U.M.W. gave 60-days' notice of termination of the national contract to a number of truck mine operators on Tennessee Products and Tennessee Consolidated leases. The contracts were cancelled because the operators had failed to pay the royalties due the Welfare Fund and had failed to pay the vacation pay due under the contract.

### Sewanee Coal Operators Association

At this point the truck mine operators formed the Sewanee Coal Operators Association for the purpose of representing them in collective bargaining with the U.M.W. Grundy Mining Company was a member of the Association. Although Tennessee Consolidated and Tennessee Products were not members, it is obvious that they were influential in the formation of the Association. An agreement was effected between the Union and the operators to continue mining operations pending the outcome of the negotiations. A brief strike occurred in October 1962 at Grundy's mine, but the U.M.W. sought to get the miners back

---

7. These matters were before this Court in the case of Gibbs v. United Mine Workers of America, 220 F.Supp. 871, wherein the Court discussed them at some length. Upon appeal the verdict of the jury in that case was set aside by the Supreme Court for lack of "clear proof" of the U.M.W.'s responsibility. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.

on the job. Over the next two or three months negotiations were held between the Association and the Union. In these negotiations the operators sought to get a sliding scale of wages to be based upon the varying degrees of mechanization in the mines. They also sought reduced welfare fund royalties. The Union sought to negotiate the national contract with security from Tennessee Products and Tennessee Consolidated for payment of the welfare fund royalties. These negotiations continued from October 1962 through January 1963 without results. However, on December 26, 1962, the miners in most of the Southeastern Tennessee coal field ceased working. An immediate reason for the strike was that Grundy Mining Company had refused to deduct union dues and had refused to recognize the Union Mine Committee. The failure to reach a contract was the overriding reason, however. While it does not appear that the U.M.W. called the strike, it is clear that it sanctioned and approved the strike.

The strike, which commenced on December 26, 1962, was accompanied by mass picketing at the road junctions leading to the major mine areas in the field. This strike was still continuing in 1965 at the time that proof was taken for this trial. The U.M.W. has continued support of the strikers by relief payments. Grundy Mining Company did not operate again until October 8, 1963, although it attempted to open in May of 1963 but was prevented from doing so by mass picketing. By February of 1963 all mines on Tennessee Products property had ceased operation due to the strike. No mining on these properties had been resumed by 1965. A great deal of violence, bloodshed and destruction of property has accompanied the strike. Much suffering, deprivation and want has occurred. The Southeastern Tennessee coal field remains a blighted area. Before turning attention to these matters as they are alleged to relate to the antitrust issues in these lawsuits, it is necessary to digress for the moment to consider the special circumstances of the plaintiff, George Ramsey, in his dealings with the U.M.W.

George Ramsey, doing business as Ramsey Coal Company, has conducted strip mining operations upon his own land since about 1954. Originally he sold all of his coal to the T.V.A. and this continued until 1959. At that time he began selling to other customers and by 1964 had ceased selling to the T.V.A., getting better prices for his coal from other customers. Ramsey was a signatory to the National Bituminous Coal Wage Agreement from the time he began operations until 1960. In 1958 he was sued by the Welfare Fund for nonpayment of royalties and the following two years his payments to the Welfare Fund exceeded his profits. In fact, he lost money in 1960. In that year his employees withdrew from the U.M.W. and joined the Southern Labor Union and he terminated his U.M.W. contract. He has managed to keep his operations going throughout the troubles elsewhere in the field and as a result taken over a substantial part of the local market for coal in the area.

### Violence in the Southeastern Tennessee Coal Field

■■■ The evidence in this case reflects once again that the "history of the bituminous coal industry is written in blood as well as in ink". Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263. In reviewing this evidence, it must be borne in mind that the presence or absence of violence in the record is relevant only as it may be charged to the U.M.W., and then only as it may bear witness to a conspiracy to monopolize the coal industry or to drive the plaintiffs from the industry by predatory competitive means. As stated by the Supreme Court in the case of Apex Hosiery Co. v. Leader, 310 U.S. 469 at 513, 60 S.Ct. 982, at 1002:

> "Restraints not within the Act (i. e., Sherman Act) when achieved by peaceful means, are not brought within its sweep merely because, without other differences, they are attended by violence."

The responsibility of the U.M.W. for such violence, as well as the relevance of such violence to a Sherman Act conspiracy, must be "clearly shown".[8]

The evidence with respect to picketing and violence directed toward Tennessee Consolidated and Grundy Mining Company during the year 1960 was much the same upon this trial as in the trial before this Court in the case of Gibbs v. United Mine Workers of America, 220 F.Supp. 871. Although no Sherman Act charge was there involved, as heretofore noted, the Supreme Court set aside a jury verdict for the plaintiff in that case upon the ground that "clear proof" of U.M.W.'s responsibility for such picketing and violence did not appear in the record. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. It accordingly would serve little purpose to further pursue the same evidence here.

With respect to the strike which occurred on December 26, 1963, and which has been in effect since that date, the evidence is clear that the U.M.W. has sanctioned and approved the strike. The Union concedes as much. It is likewise clear that the strike has been accompanied by much mass picketing, violence and property destruction. Both sides in the dispute have suffered the effects of such violence, but the operators and those miners who sought to cross the picket lines have suffered much the worse of the violence. Without attempting to itemize the record, it may be said that homes were shot into, burned or dynamited by unidentified assailants. Coal was dumped upon the highway. Trucks and cars were fired upon numerous times. Power poles and mine equipment were dynamited. Coal tipples were burned and mine guards were fired upon. Operators were forced to abandon their mines and equipment for reasons of personal safety, with the mines and equipment suffering heavy losses from mine flooding and vandalism. Several men were killed. One intrepid operator was the intended victim of dynamite thrown into his yard from a speeding car, but he seized the lethal bundle and removed the cap just seconds before it went off. While it certainly adds no luster to the occasion, there were victims to violence upon both sides. The home of the U.M.W. District Representative was damaged by dynamite. Four local union halls were burned. Union men were shot at and union homes were burned.

The relevance of the foregoing matters to present issues does not appear in the record, however reprehensible and otherwise unlawful they obviously were. For in not a single instance was an act of violence traced to an identifiable assailant. Such assailants were described in the record only in anonymous terms. They could be referred to only in the third person. The acts were those of unknown persons. Upon this record the U.M.W. could not be held chargeable for the violence, even were the standard of proof required that of the usual civil case. Even were members of the local unions identified as the perpetrators of the wrongs suffered by the plaintiffs, in the absence of proof that the U.M.W. authorized or ratified the conduct, it could not be held responsible therefor. "The acts of one individual member no more bind the union than they bind another individual member unless there is proof that the union authorized or ratified the acts in question." United States v. White, 322 U.S. 694 at 702, 64 S.Ct. 1248, at 1253, 88 L.Ed. 1542.

Moreover, neither picketing, whether lawful or unlawful, nor violence, however heinous, can of themselves and without more constitute a Sherman Act violation, whatever other legal remedies may exist. While they can be means of accomplishing an antitrust conspiracy by a union, and thus may, in company with other relevant evidence, be themselves evidence of such a conspiracy, the conspiracy must be made to appear by more

---

8. See Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106; United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626.

than picketing or violence. In short, picketing and violence are not per se evidence of a Sherman Act conspiracy. Thus the strike, ratified by the U.M.W., and picketing to the extent that it received U.M.W. approval, and not the violence unconnected upon the record with the U.M.W., may be looked to as they may or may not demonstrate the purpose of the U.M.W. to conspire with others to impose the National Bituminous Coal Wage Agreement upon the Southeastern Tennessee coal field. The record in this regard fails to show any direct evidence of a Sherman Act conspiracy. Whether such an inference can be drawn must depend upon a review of all of the evidence upon the present phase of the case, to be followed by a review of all of the evidence upon all phases of the case.

Upon review of the evidence as it relates to the Southeastern Tennessee coal field and of the U.M.W.'s activities therein, the following conclusions appear to be clearly supported by the evidence:

(1) To operate successfully the producers in the Southeastern Tennessee coal field must be able to compete and survive on the T.V.A. coal market. Since 1954 50% or more of all coal produced in the State of Tennessee has had to find its market with the T.V.A. That figure reached as high as 78% in 1956 and by 1962 was still at 64.3%.

(2) Due to the geological conditions, the Southeastern Tennessee coal field cannot achieve a level of productivity equivalent to that of its principal competitors on the T.V.A. coal market. This competitive disadvantage is offset in part by the transportation and quality advantages which the field has over its principal competitors in the T.V.A. market at the Widow's Creek steam plant.

(3) In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due

to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.

Further than this the Court cannot go. Clear proof does not appear, either directly or by inference, that the U.M.W. acted other than unilaterally in furtherance of its own interests and purposes in its activities in the Southeastern Tennessee coal field in the period here under review. In this regard the plaintiffs rely upon the defendant's advocacy of mechanization as a solution to the operators' competitive difficulties as one element of proof demonstrating a conspiracy, in that the U.M.W. was in fact attempting to force mechanization upon a coal field which it knew to be unsuited by geology therefor and at a rate that the U.M.W. knew was impossible for all but the largest coal operators in the nation. This contention does not appear to accord with the evidence. In the first place, it does not appear that mechanization would be ineffective in rendering the Southeastern Tennessee coal field competitive. Both Allen & Garcia and Grundy Mining Company appear to have been well on the way toward raising productivity to competitive levels by mechanization when their efforts were thwarted or halted by seniority and strike difficulties. In the second place, it does not appear that mechanization is beyond the economic capacity of all but the larger producers on the national scene.

▪ Of course, the existence of a conspiracy is not a prerequisite to a removal of a labor union's exemption from the antitrust laws. Under the rule set forth in the case of Local Union No. 189, etc. Meat Cutters Union v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.

2d 640, it may lose its exemption, even though it acts unilaterally, if it pursues a course violative of the Sherman Act and not directly and immediately related to a mandatory purpose of collective bargaining, such as wages, hours and working conditions. Thus a labor organization, by advocacy of or opposition to mechanization per se, even though acting unilaterally might come within the rule laid down in the *Jewel Tea* case and might thereby expose itself to an antitrust charge. However, here it appears conceded by the plaintiff that mechanization of the mining industry was but the necessary consequence of the U.M.W.'s seeking a uniform national wage scale at a level alleged to be excessively high. As to the opposition to mechanization experienced by Allen & Garcia, this appears to be directly related to the Union's interest in the seniority issue. Both wages and seniority are legitimate subjects of collective bargaining.

 With respect to the other evidence on this phase of the case, the evidence does not demonstrate that the U.M.W. acted in conspiracy with employers elsewhere in its dealings with the plaintiffs and others in the Southeastern Tennessee coal field.

 Though the law may provide other remedies for the interruption, hindrance or obstruction of business by mass picketing, violence or other activity in which a union may be found responsible, the antitrust laws provide no part of that remedy unless the union by its activity exceeds its antitrust exemption, such as by acting in furtherance of a conspiracy. Lacking such a conspiracy, the U.M.W., by reason of its labor exemption, was free to pursue its policy of national uniformity in wages and working conditions without violation of the antitrust laws. So long as it acted unilaterally, and not in conspiracy with other coal producers, the U.M.W.'s efforts to achieve national wage uniformity could not be accused of having an antitrust taint. Under such circumstances the U.M.W. could not be required, as a means of escaping antitrust liability, to bargain for labor standards, wages or working conditions that would improve the plaintiffs' competitive position by the reduction of wages or labor standards, by gearing wages to the status of mechanization or its lack, or by tying wages to productivity.

## CONCLUSION

There remains to be accomplished an evaluation of the full record upon the trial of this case, when viewed as a whole, rather than when viewed in segments as has thus far been necessary. Having taken a look at the individual figures one by one, it is now the duty of the Court to look at the panorama. American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93.

The central relevant inquiry at this point is whether all of the evidence, when viewed as a whole, clearly manifests a union-businessmen combination to achieve a predatory anti-competitive end. Otherwise the union activity here complained of would come within the Congressionally established labor organization exemption to the antitrust laws.

The plaintiffs' contentions, reduced to their essence, are that the U.M.W., while purporting to act for the elimination of substandard wages, in reality conspired with the large coal producers of the nation to drive from the coal industry large segments of that industry, including the plaintiffs, who were not favored by geography, geology and economics. This conspiracy originated at the time of the negotiation of the 1950 National Bituminous Coal Wage Agreement between the U.M.W. and the major operators, the parties acting under the guise of giving "stability" to the industry. Thereafter steps were repeatedly taken to tighten the conspiracy, including large successive wage and fringe benefit increases, the payment of which would be possible only by rapid mechanization which in turn could be accomplished only in the favored coal fields. Another bold step in tightening the conspiracy was the execution of the Protective Wage Clause in the 1958 contract amendment. Increased organizational and enforcement activity was engaged in by the U.M.W. to

apply the labor-cost squeeze upon the segment of the industry scheduled for elimination. The rapid expansion of the T.V.A. market in the 1950's called the U.M.W.'s specific attention to the Southeastern Tennessee coal field and the plaintiffs. Thereupon large coal companies, with heavy financial support from the U.M.W., dumped large quantities of coal upon the T.V.A. market to drive prices down. To still further tighten this labor cost-market pricing squeeze upon the plaintiffs, the U.M.W. eventually fomented strikes, engaged in mass picketing and resorted to violence. In this manner the defendant succeeded in its efforts to drive the plaintiffs from the coal industry.

To support the plaintiffs' theory of the Sherman Act conspiracy, the plaintiffs must rely entirely upon circumstantial evidence, with the sole exception of the proof relating to the Protective Wage Clause. The Court has previously dealt with the Protective Wage Clause and found no conspiracy there. All of the direct evidence in the record expressly denies the plaintiffs' contentions of a conspiracy. Every officer of the Union who testified, as well as every representative from the coal industry alleged to be in on the conspiracy, denied its existence. While this testimony must be weighed in the light of the self-interests of the witnesses, it cannot be ignored. Moore v. Chesapeake & O. Ry. Co., 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547; Benton v. Blair, 5 Cir., 228 F.2d 55. To overcome it, the Court must wholly resort to inferences to be drawn from the remaining proof. In this regard the Court cannot overlook the fact that while reasonable inferences are a sufficient basis to support a finding of antitrust violation, speculations and conjecture are not. United States v. Morgan, D.C., 118 F.Supp. 621; New Grant Patten Milk Co., Inc. v. Happy Valley Farms, Inc., D.C., 222 F.Supp. 319. The separation of reasonable inference from speculation and conjecture is not easily accomplished, for there is no fixed line at which the two are separated. The Court likewise cannot overlook the fact

that the standard of proof imposed upon the plaintiffs is that of "clear proof" rather than a mere preponderance of the evidence. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. Finally, it must be borne in mind that to be relevant, an inference must relate to the existence or execution of a U.M.W.-industry antitrust conspiracy and not be merely an inference with regard to U.M.W. responsibility for the plight of the plaintiffs.

Reviewing the evidence as a whole in this light, the Court is unable to find that the evidence clearly reflects that the plaintiffs were the victims of any conspiracy between the U.M.W. and any coal operators or other non-labor organization to eliminate or suppress competition in the coal industry or to eliminate or suppress the production and sale of coal by the plaintiffs. While many inferences favorable to the plaintiffs' contentions can reasonably be drawn from the evidence, in every instance a no less equally reasonable inference can be drawn to the contrary. The latter, when coupled with the positive denial by many witnesses of any conspiracy, as well as other inferences favorable only to the defendant's contentions, do not permit a finding based upon clear proof of an antitrust conspiracy.

Thus, while the execution of the 1950 National Bituminous Coal Wage Agreement between the U.M.W. and the northern operators, with the Union giving up its share-of-the-work concern for its members and the industry agreeing to substantial wage and fringe benefit increases, and each party expressing their concern for bringing stability to the coal industry, might lead to the inference that stability was being sought by means of an industry-union conspiracy to suppress or eliminate competition from the smaller operators, it is more reasonable to infer, however, that the agreement reached was the result of the most vigorous unilateral effort each party could muster. A more vigorous clash of interests or a more turbulent demonstration of what appeared to be arms' length collective bargaining has rarely been recorded in

the history of labor-management relations than that which led up to the execution of the 1950 National Bituminous Coal Wage Agreement.

That the U.M.W. negotiated the 1950 National Bituminous Coal Wage Agreement with the spokesmen for the major coal producers in the nation and then has uniformly sought to impose the same agreement upon all the rest of the coal industry might reasonably lead to the inference that the U.M.W. had agreed with the major operators that it would impose the national agreement upon the rest of the coal industry. An equally reasonable inference is that the Union was but following the pattern of industry-wide bargaining established since prior to the turn of the century in electing to negotiate the agreement with spokesmen of the major coal producers and was but following its historical policy of national uniformity of labor standards in seeking to impose the national agreement upon all of the industry. In the latter event, no inference of antitrust violation could arise, for, as stated in United Mine Workers v. Pennington, supra, "Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some of the employers cannot effectively compete if they are required to pay the wage scale demanded by the union." Wages as an element of price have been expressly removed by Congress from the competitive requirements of the antitrust laws. Labor is not required to become the fulcrum of price competition to avoid a Sherman Act charge, for, as held in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, an elimination of price competition based upon labor standards is not within the Sherman Act.

Moreover, to suppose that national collective bargaining can or will be conducted with other than major producers of an industry is a theory unrelated to the hard realities of a competitive economy. To suppose that major operators can or will be the guardians or protectors of the small and weak in the industry in such national bargaining is also largely a theory unlikely to relate to the realities of a competitive economy.

The problems posed to the small and medium sized enterprises by the practice of national collective bargaining would appear real and substantial. However, that their solution lies in the federal anti-trust laws as now enacted by Congress is doubtful.

The turbulent pattern of bargaining in the 1940's followed by the peaceful and harmonious pattern of bargaining between the U.M.W. and the B.C.O.A. in negotiating a series of amendments to the National Bituminous Coal Wage Agreement during the decade of the 1950's which amendments provided for substantial increases in wages, welfare fund royalties and other benefits, might reasonably lead one to suspect that such harmony was achieved at the expense of a conspiracy directed at the smaller operators. Such peaceful and harmonious pattern of bargaining could as reasonably lead to the inference that the parties were acquiring maturity in the practice of collective bargaining and that collective bargaining was accomplishing its stated purpose of eliminating industrial warfare.

That the substantial increase in wages, welfare fund royalties and other benefits negotiated between the U.M.W. and the B.C.O.A. between 1950 and 1960, and in subsequent years, have provided a strong stimulus for mechanization of the coal mining industry, if in fact they have not made such mechanization essential to survival in the industry, cannot be doubted. One could possibly infer from this that it demonstrated a conspiratorial purpose between the U.M.W. and the large and favored coal operators to drive from the industry those whose mines were not as suited to mechanization or whose finances would not permit the heavy capital investment incident thereto. Again, a more reasonable inference would be that the wage and other benefits negotiated in the coal industry but followed the

pattern set in the basic industries in the nation. Such increases in the coal industry were in line with or in some instances a little behind the scale in the steel, automotive and rubber industries during the same period of time. As for mechanization, it is equally as reasonable to attribute it to the competition faced by coal from other energy sources as to charge it to increased labor costs. As shown by the charts in Appendix "A" to this opinion, a veritable revolution has occurred in the fuel and energy market since 1945, with coal losing many of its former markets and losing both relatively and absolutely to gas and petroleum fuels. Coal has been forced to mechanize to survive in the fuel market. Changes in production methods generated by the effects of competition between fuels and energy sources do not equate to a Sherman Act conspiracy.

That U.M.W.'s heavy investment in West Kentucky Coal Company and subsequent heavy losses on that investment presents a highly questionable series of transactions, does not here raise an inference of a Sherman Act conspiracy directed toward these plaintiffs, as the record does not support the plaintiffs' contention that West Kentucky Coal Company, nor other coal companies charged with complicity in the conspiracy, did in fact engage in the predatory pricing of coal upon the T.V.A. coal market. The downward pressure of the prices, or the "price squeeze", upon the T.V.A. market may be accounted for by the competitive force generated by public bidding as well as by other policies and practices of the T.V.A. in the purchase of coal and in the integrated manner of operating its widespread system of steam generating plants drawing on many coal fields.

Finally, U.M.W.'s activities in recent years in the Southeastern Tennessee coal field can be explained equally as well as being unilateral action in pursuing its own interests and policies as they can be explained by inferring that U.M.W. was acting in furtherance of a conspiracy. That it may have acted unwisely, unreasonably, mistakenly, or even wrongfully does not raise an inference of conspiracy that exceeds in weight or reason the inference that it acted unilaterally.

The evil days that have fallen upon the Southeastern Tennessee Coal field in recent years and the woes and misfortunes that have befallen the plaintiffs may be explained by many factors and conditions that are not demonstrative of a Sherman Act conspiracy. These include the pyramiding of leases, with the resulting increased royalty or rental payments, adverse geological conditions, to which reference has been made, and under-capitalization, with the resulting attempt to mine coal by hand or other antiquated methods in an era when not only coal but all fuel and energy is produced on a mechanical and mass production basis. In this latter regard the competition of other fuels has completely altered the coal market in Tennessee, as elsewhere, since 1950. The loss of the retail market by coal to electricity, oil and gas has been as evident in Tennessee as elsewhere, if not more so. The electric steam plant market which has replaced the retail market and other former coal markets in Tennessee is a low price, high volume market and consequently a more competitive market. Although the Southeastern Tennessee coal field appeared to have done well upon this market until about 1956, this can in part be explained by the rapid expansion of the T.V.A. coal market during this period, particularly at the Widow's Creek steam plant. However, by 1956 the Widow's Creek plant had the highest electric production cost of any plant in the T.V.A. system. Electric production was shifted to other plants with the result that coal consumption at Widow's Creek dropped from 2,366,000 tons in 1956 to 1,150,000 tons in 1959. This cutback was a significant contributing factor to the difficulties encountered by the Southeastern Tennessee coal field during the corresponding period.

Did not the clear evidence rule apply, the Court might have reached a different conclusion upon certain issues. Likewise, did the prima facie rule, as announced by Justice Douglas in the

*Pennington* case apply, a different view of the evidence would have been required. These matters have been previously dealt with by the Court.

Finally, it is apparent that a major part of the hope for the Southeastern Tennessee coal field lies in the direction of increased productivity. Whereas productivity in Tennessee was about in line with productivity throughout the nation for underground mines in 1950, since that time productivity of underground mines elsewhere has steadily risen while those in Tennessee have tended to remain constant or rise to a smaller degree. Whereas productivity in underground mines was at a level of approximately 5½ to 5¾ tons per man-day in 1950, both in Tennessee mines and in underground mines throughout the nation, by 1960 national productivity had risen to 10.64 tons, whereas Tennessee mines advanced only to 6.70 tons. By 1963 the gap had further widened with national productivity rising to 12.78 tons but with Tennessee mines advancing only to 7.80 tons per man-day.

Increased productivity involves many factors of which machines are only a part. The human element, both on the side of management and on the side of labor, remains of prime importance. That coal can again be mined in the Southeastern Tennessee coal field and sold on the market with a fair profit to management and a fair wage to the miner would appear assured, given competent and progressive management, given understanding and effective union leadership, and given industrious and competent labor. How long before these conditions may prevail, no one can now tell.

In view of the conclusions of the Court as set forth in this opinion, there is no need for the Court to rule upon the various motions of the defendant upon which action was reserved at the time of the trial. An order will enter in accordance with this opinion.

APPENDIX A

## CHART 1. UNITED STATES CONSUMPTION OF ENERGY FUELS AND WATER POWER IN PERCENT OF B.T.U.'s, 1940–1964

## CHART 2. UNITED STATES CONSUMPTION OF BITUMINOUS COAL BY CONSUMER CLASSES, IN PERCENT, 1940–1964

## CHART 3. TRENDS IN BITUMINOUS COAL PRODUCTION IN THE UNITED STATES AND TENNESSEE, 1940–1964

## CHART 4. UNITED STATES TOTAL PRODUCTION OF BITUMINOUS COAL IN PERCENT, BY SIZE OF ANNUAL OUTPUT, 1940–1964

## CHART 5. TENNESSEE TOTAL PRODUCTION OF BITUMINOUS COAL IN PERCENT, BY SIZE OF ANNUAL OUTPUT, 1940–1964

438

## CHART 6. NUMBER OF BITUMINOUS COAL MINES, BY SIZE OF ANNUAL OUTPUT IN THE UNITED STATES, 1940–1964

## CHART 7. NUMBER OF BITUMINOUS COAL MINES, BY SIZE OF ANNUAL OUTPUT, IN TENNESSEE, 1940–1964

## CHART 8. UNITED STATES TOTAL PRODUCTION OF BITUMINOUS COAL BY METHOD OF MINING, IN PERCENT, 1940–1964

## CHART 9. TENNESSEE TOTAL PRODUCTION OF BITUMINOUS COAL BY METHOD OF MINING, IN PERCENT, 1940–1964